John Springer died intestate at Judith Gap, Wheatland county, Montana, on November 18, 1918, leaving surviving his widow and a minor son. The widow intended to and did take her husband's remains to his former home in Minnesota for burial. Before setting out upon this journey she consulted James G. Alexander, then cashier of the Security State Bank of Judith Gap, and N.R. Barncord, a lawyer practicing at that place, with respect to the condition of her husband's estate. She told them that Louis B. Springer, her husband's father, had offered to give her money enough to enable her to get back to her people, but claimed all the property upon the ranch which her husband had been operating. The ranch belonged to Louis B. Springer. She said that unless she took some action to prevent him from doing so he would take all of the property and leave her nothing. After considering the situation it was arranged that she would ask the court to appoint Mr. Alexander administrator of her husband's estate and that Mr. Barncord should act as the attorney for the administrator.
Mr. Alexander was appointed administrator upon December 20, 1918. Pursuant to the court's order he gave bond in the penal sum of $12,000.
It was found that Louis B. Springer was in possession of the ranch and was taking active steps to dispose of the personal *Page 259 
property there. About January 1, 1919, in Mr. Barncord's office, Springer told Barncord and Alexander, in effect, that he was virtually the owner of the property, as he had advanced the money to pay for it, and he proposed to retain it. He said also that he represented L.B. Springer, Jr., a brother of the deceased, whom he claimed was a copartner of the deceased in the ranching operations, L.B. Springer, Jr., then being with the United States army overseas. While the administrator and attorney did not believe these assertions they did not then have any means of disproving them. Springer insisted upon an immediate sale of the property. After some controversy a sale was agreed upon, with the understanding that the proceeds thereof should be paid to the administrator to be held until the question of ownership might be determined. Terms of sale were discussed. Springer insisted that if the property were sold for cash the sale would be a failure and said it would be advisable to take notes from persons who were considered solvent. It was agreed that notes should be taken leaving the name of the payee blank until it could be determined who was entitled to the property. The terms of the sale as insisted upon by Springer were, a discount of five per cent for cash, or notes due in one year with interest at ten per cent per annum.
On December 20, 1918, appraisers of the estate were appointed. On January 27, 1919, they returned an inventory and appraisement in which the property of the estate was valued at $2,056.90. The property was sold at public auction on January 31, 1919, as upon an administrator's sale. The notes and cash received were turned over to the administrator. Shortly thereafter Springer went to Minnesota, and it would seem that he and Mrs. Springer, the widow, remained there two or three years. The administrator testified that no attempt to close the estate was made for the reason that "it was not determined what portion of the estate belonged to L.B. Springer or his son L.B. Springer, Jr." In the meantime Springer presented three claims against the estate, aggregating *Page 260 
$1,964.85. These were approved by the administrator and by the court in December, 1921.
During the spring of 1922 Mrs. Springer returned to Judith Gap. Shortly thereafter a settlement of the controversy over the property was agreed upon by Mrs. Springer, Louis B. Springer and the administrator, subject to the approval of the court. This agreement, as the court found, was "that the said L.B. Springer, Sr., was to be paid the sum of $500.00 cash, and to be delivered the promissory notes that have been filed as evidence in this estate, and that the widow was to be paid the family allowance, the sum of $2,500.00." Pursuant thereto the administrator then paid over to Mrs. Springer $2,500, and about March 15, 1923, tendered the sum of $500 and the notes to Emmet O'Sullivan, who then was attorney in fact for Springer under a power of attorney which Springer had executed on February 24, 1923. Mr. O'Sullivan demanded the payment of $1,000 in addition to the notes. When the administrator refused to accede to this, O'Sullivan, on March 15, 1923, at the request of Springer filed in the court a petition for the revocation of the letters theretofore granted to Mr. Alexander, and asked that letters be issued to himself. Some time later Alexander filed an answer to the petition. On September 27, 1923, O'Sullivan asked leave to file a supplemental petition, which was granted, and on October 9 he filed the same in which he represented that Alexander had permanently removed from the state of Montana. On October 8, 1925, Alexander filed an account of his administration, in which he incorporated the substance of two former accounts, one filed December 12, 1921, and the other on April 9, 1923. The last account, filed October 8, 1925, commences: "Account of James G. Alexander, formerly administrator of the estate of John Springer, deceased." It sets forth the fact that on March 20, 1923, Alexander was served with a citation together with a petition for the revocation of his letters; that on March 27, 1923, he filed his answer to the petition for removal, that on the twenty-second *Page 261 
day of December, 1923, a reply to the answer was filed; that on the thirteenth day of December, 1923, O'Sullivan filed a supplemental petition and that "by an order duly given and made on the fifth day of January, 1924, James G. Alexander as administrator of the estate of John Springer, deceased, was removed on the ground and for the sole reason that he had permanently removed from the state of Montana," and that on the 19th of January, 1924, letters of administration were issued to Emmet O'Sullivan; that on February 16, 1924, O'Sullivan as administrator filed an action in the district court of Wheatland county against James G. Alexander and American Surety Company of New York to recover the sum of $5,696.88, and that the action resulted in favor of the defendants in the district court and later in the supreme court. Alexander then claimed credit for the sum of $420.87 paid out as attorney's fees and expenses on account of the litigation, $75 to W.C. Husband for the purpose of preparing and presenting the final account, and $61.32 on account of premiums paid the surety company on the bond, making $556.89 in all. A copy of the answer to the original petition for revocation of his letters was annexed to the account as Exhibit "A."
Objections to the three accounts were filed by O'Sullivan as administrator. The accounts and objections thereto were set down for hearing on December 22, 1925. The court heard the testimony offered and upon June 14, 1926, handed down its findings of fact and conclusion of law. It found in substance that L.B. Springer, Sr., the father of the deceased, claimed to be the rightful owner of all the personal property included in the inventory and that the property was sold without an order of court by Springer; that the administrator never received actual possession of the property but received the proceeds from the sale thereof in the sum of $1,718.11 in cash and $1,814.11 in notes, and that the total amount received by the administrator from all sources is the sum of $6,185.25; that he made disbursements amounting to $3,831.50, *Page 262 
the principal item of which was "Paid Mrs. John Springer, widow's allowance, $2,500"; and that in addition Alexander incurred as expenses of administration the "sum of $556.89, which expense was incurred subsequent to January 19, 1924"; that the promissory notes amounting to $1,814.11 were surrendered and introduced in evidence at the hearing; that Alexander as administrator had "acted in entire good faith, and that he was not guilty of any inattention, neglect, mismanagement or dishonest conduct in the administration of the estate"; that there had not been any loss or depreciation in the property or assets of the estate coming into his possession due to any misconduct on part of himself or his attorney; that there had been delay in the administration of the estate but not through Alexander's fault, and the delay had not caused any loss to the estate; that Alexander as administrator "made a valid, fair and satisfactory compromise settlement with the widow of the deceased, and with L.B. Springer, Sr., the father of the deceased, which settlement determined the conflicting claims in and to the property and their interest in said estate"; and that the "settlement is binding upon the estate and is hereby approved." As a consequence the court concluded as a matter of law that the final account of Alexander "should be approved, allowed and settled." O'Sullivan as administrator, referred to hereafter as the contestant, filed exceptions to the findings of fact and conclusion of law, which were overruled by the court. From the order approving the account of Alexander and from the order overruling and denying the exceptions to the findings of fact and conclusion of law contestant has appealed.
In considering the matters presented the district court found an estate which had been conducted with little regard for the directions of the statutes. The property of the estate had been sold without an order of court and had passed into the hands of bona fide purchasers. The money received by the administrator from all sources, with the exception of a few hundred dollars, had been disbursed. Stubborn facts confronted *Page 263 
the court: like the noted financier, it found the "eggs had been scrambled." Being unable to restore the status which existed when the administration began, the court sensibly undertook to ascertain whether, despite the disregard of the statutes, the administrator had acted in good faith, and with due consideration for the rights of the creditors and the heirs; whether he had conserved the property of the estate and had not suffered it to be wasted or lost through his mismanagement; whether he had acted honestly, without profit to himself, and had not caused loss to others through his act or neglect. The court concluded, as we have seen, that the administrator had acted in entire good faith and had not been guilty of any inattention, neglect, mismanagement or dishonest conduct, and there had not been any loss or depreciation in the property or assets of the estate coming into his possession.
These findings have been challenged by the contestant in great detail. In fact he objected to practically everything which the administrator did or caused to be done. We shall not take the time to consider these objections in detail. Rather we shall follow the policy of the district court in an attempt to ascertain whether in fact, in reaching the result announced by the court, substantial justice had been meted out.
When John Springer died his sole heirs were his widow and infant son, then about a year old. Louis B. Springer, father of the decedent, notwithstanding some apparent contention to the contrary, was not an heir of the decedent, not entitled to share in his estate. Whether the child is still living the record does not reveal, but we shall presume that he is. If, however, the child has died, his mother has succeeded to his interest in the estate (sec. 7073, Rev. Codes 1921, subd. 2), and therefore is entitled to the entire residue of her husband's estate.
At the expense of repetition it must be remembered that when the sale took place the ownership of the property sold was not determined. It is clear that Louis B. Springer, the decedent's *Page 264 
father, claimed to own the property and that neither the widow nor the administrator was in position to disprove the claim. While in the interest of regularity it would have been wise if an order of sale had been obtained by the administrator, the fact is that Springer had possession of the property and it would seem that he was the dominating factor in the conduct of the sale. In compelling the proceeds of the sale to be turned over to the administrator to await the determination of the question of title to the property, the administrator and his counsel rendered high service to the estate. By that act they saved the property for the estate and avoided litigation the result of which might have been doubtful. While the property of the estate was appraised at $2,056.90, the amount obtained from the sale was $3,595.22. The property must have brought the full value at the sale; there is no assertion to the contrary. It is true that the administrator, without an order of court, should not have received notes in payment for the property sold but that condition was brought about by the insistence of Springer who insisted that he owned the property which was sold. After the sale nothing seems to have been done toward determining the status of the title to the proceeds of the sale until the return of Mrs. Springer in 1922, but no one seems to have complained about it. No one is complaining about it now except the contestant and, probably, Springer.
When the creditors were paid the record does not disclose, but it would seem that all have been paid. While the cash received from the sale was in possession of the administrator he deposited it in the bank, of which he was the cashier, and paid interest upon the daily balances.
It is obvious from the record that this controversy was projected by Louis B. Springer. In February, 1923, he gave his power of attorney to O'Sullivan who, as we have seen, commenced proceedings to remove Alexander as administrator in March, 1923, this being finally accomplished on January 5, 1924. In the meantime Alexander filed his third account, which met with the approval of the court. When this controversy *Page 265 
arose the only persons interested in the estate were the widow, her son, and Springer, who finally appeared in the role of a[1] creditor. In the compromise agreement Springer had consented that $2,500 should be paid to the widow as a family allowance. The administrator paid it. This was irregular but the court had full authority to approve the action. The widow was entitled to a reasonable provision for the support of herself and child. (Sec. 10144, Rev. Codes 1921.) The court in its discretion could have made a reasonable allowance out of the estate for the widow and child during the progress of the settlement of the estate (within reasonable limitations as to the time of settlement, of course), the estate not being insolvent. (Sec. 10146, Rev. Codes 1921; In re Dougherty's Estate, 34 Mont. 336,86 P. 38.) This estate was not insolvent. The sum of $2,500 for the support of the widow and her child — and it must be assumed that she supported the child — from the date of the decedent's death to the time the money was paid, cannot be considered exorbitant. The fact that the administrator paid the widow this sum of money for the support of herself and minor child without a previous order of the court does not deprive him of the right to credit therefor when the court found the amount paid was reasonable and proper. (In re Lux's Estate, 100 Cal. 608,35 P. 345, 114 Cal. 89, 45 P. 1028; In re Fernandez's Estate,119 Cal. 579, 51 P. 851.)
Objection is made that the administrator did not present[2] vouchers for certain amounts which he paid, but the court was satisfied from the evidence that the amounts were paid by the administrator to the persons, and for the purposes, as alleged, and that the requirements of section 10297, Revised Codes 1921, respecting the absence of vouchers had been met sufficiently. (12 Cal. Jur. 39.) The contestant did not offer any testimony to refute the showing made. We shall not disturb the court's conclusion.
The contestant complains that the former administrator caused[3] a second inventory and appraisement to be made *Page 266 
and returned, which contestant says was useless and therefore the expense entailed should be disallowed. But he overlooks the fact that the second appraisement was made by order of the court.
The contestant also complains that the court should not[4] approve the payments made to the administrator's attorney for legal services, $270, and a like amount to himself. The administrator received from all sources $6,185.25, including the notes. He might have been allowed $329.26 under the provisions of section 10287, Revised Codes 1921, upon the closing of the estate. As the court found he was not guilty of unreasonable delay in closing the estate, had acted in good faith throughout, and was not subject to criticism for any action, it was justified in approving the payment the administrator made to himself. The court did not err in approving the payment of $270 to Barncord.
After Springer concluded to withdraw his claim of ownership to the property and to receive payment upon the claims which he had filed against the estate by accepting $500 in cash and the notes, his interest in the estate ceased.
After the settlement with Springer there was in the possession of the administrator, according to his account, $512.55 in cash, or at any rate, he had that sum upon March 1, 1923. If this arrangement had been carried out, and the estate had been closed immediately as it should have been, the administrator would have turned over to the heirs — that is, the widow and the son (if the son were living) — that sum of money, less any further allowance to the administrator the court might have seen fit to make.
From the evidence the court was justified in finding that there had not been any loss or depreciation in the property or assets of the estate due to any misconduct of Alexander or his attorney, and that he had not been guilty of any misconduct or dishonesty in the management of the administration. There was delay, some of which Alexander might have prevented. But others, and particularly Springer, were more to blame than was Alexander. *Page 267 
We agree that the settlement between Alexander as administrator and Springer should be approved. This results in substantial justice to all. It is regrettable that the administrator and his counsel did not follow out the directions of the statutes, but his failure to do so does not restrict the authority of the court to bring the estate to a close as justice requires. There is substantial evidence to uphold all the court's findings except as hereafter noted.
Instead of carrying out the settlement between the former[5] administrator and Springer, the contestant commenced an action against Alexander and his bondsmen which resulted in failure in the district court as well as in this court. (O'Sullivan v. Alexander, 73 Mont. 12, 234 P. 1099.) Alexander in his final account claimed credit for $420.57 paid out by him on account of that litigation. He also claimed credit for $75 which he had obligated himself to pay W.C. Husband, Esq., for preparing the final account. The court allowed these items and in so doing we think it erred.
The administrator "shall be allowed all necessary expenses in the care, management and settlement of the estate, including a reasonable fee paid to attorneys for conducting the necessary proceedings and for conducting necessary actions in courts, or incurred therefor," in the language of section 10285, Revised Codes 1921. In making an order fixing or allowing counsel fees the court must find that the administrator needed the services of counsel and that the services were worth something to the estate. (11 Cal. Jur. 1203.) The legal services must have been rendered to the estate. (Estate of Brignole, 133 Cal. 162, 65 P. 294.)
A test as to whether an administrator is entitled to credit for counsel fees paid is, has counsel rendered services for the benefit of the estate? (24 C.J. 99.) Here the administrator had been removed from office. The suit was against him as an individual and against the surety upon his bond. While the basis of the action was that as administrator he had caused loss to the estate, the suit was not against the estate. Under *Page 268 
these circumstances it seems clear that the estate is not liable for the payment of attorney's fees incurred by Alexander and the surety in defending the suit. (See In re Byrnes' Estate,122 Cal. 260, 54 P. 957, 1015.) It was unfortunate that Alexander and the surety company were subjected to the harassment of a lawsuit which was without foundation, but this is a frequent occurrence in the business world; and frequently the recourse for those who thus have been subjected to the expense and inconvenience of an unjust lawsuit is measured only by the statutory costs.
Nor is Alexander entitled to the sum of $75 for the preparation of the final account. It was the duty of Mr.[6] Barncord, the attorney for the estate, who had been paid $270, to prepare the final account. No reason is apparent why another counsel was employed for that purpose.
Objection is made to the amount of premiums paid by Alexander[7] to the surety company for his bond. It seems that Alexander served as administrator for five years and twenty-three days and that he paid six premiums upon the bond. While it is not asserted that the administrator should not have credit for any premiums paid upon the bond it is urged that he should be credited for premiums paid only during the period which was reasonably necessary for the administration and settlement of the estate, not for that period during which settlement of the estate was unduly delayed. But as the court found that none of the delay was attributable to Alexander, and as we can see no good reason to disturb that finding, this contention cannot be sustained. We are in doubt as to the payment of one year's premium, but this we resolve in favor of the trial court.
We have not seen fit to comment upon every objection made by the contestant, but we have examined the record carefully and have considered all of the objections made. We have discussed only those which we have deemed worthy of notice. The findings of fact and conclusion of law entered by the trial court are approved in all respects, except as to the sums of money allowed Alexander for defending himself and his surety against *Page 269 
the action brought against them by O'Sullivan as administrator, and as to the $75 agreed to be paid by Alexander to Husband.
The district court of Wheatland county is directed to modify its findings of fact and conclusion of law accordingly and when so modified the same shall stand affirmed.
Before concluding we again call attention to the rules of this[8] court which have been adopted for the convenience of court and counsel. They are simple and easily obeyed. But little attention has been paid to them in arranging the transcript in this case. The index is almost useless. In thirty-one instances it fails to give any information as to the particular document referred to. The bill of exceptions was not engrossed after settlement. In consequence the arrangement of the documents in the transcript is extremely confusing and much useless matter has been inserted. Appellant would not have just cause for complaint had we seen fit to dismiss this appeal. It is ordered that the appellant pay all the costs of this appeal except for the appearance fee and brief of respondents.
Modified.
ASSOCIATE JUSTICES MYERS, STARK, MATTHEWS and GALEN concur.