IN RE RUSSELL'S ESTATE. RUSSELL, EXECUTRIX, *v.* RUSSELL, RESPONDENT.

(No. 7,467.)

(Submitted April 24, 1936. Decided May 8, 1936.)

[59 Pac. (2d) 777.]

*Mr. T. J. Davis,* for Appellant, submitted a brief and argued the cause orally.

*Mr. H. L. Maury, Mr. A. G. Shone* and *Mr. J. F. Emigh,* for Respondent, submitted a brief; *Mr. Maury* and *Mr. Emigh* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an appeal from a decree of the district court of Silver Bow county settling an account of Anna Russell, as executrix of the last will and testament of Joseph Russell, deceased.

Joseph Russell died in Silver Bow county on or about May 11, 1932. He left a will in his own handwriting reading as follows:

"Butte, Montana, February 10, 1932.

"I hereby devise and bequeath to my wife, Anna Russell, all my right, title and interest to all my possessions and hold-ings, including the stock of the various companies, namely 450 shares of Bethlehem Steel—Joseph Russell Realty Co. & Rus-sell Oil Co. to be held by her in Trust for the following chil-dren: Joseph Russell, Jr. (Orlan) Russell Wirak, Pauline Wirak, Theo Wirak, Owen Wirak, Richard Wirak and Joseph Wirak, until the youngest (twins) become of age and with a strict understanding however that my wife, Anna Russell will be provided and shall have out of such property whatever money it may be necessary for her comfort and well being and to that extent and for that purpose her said trust shall con-tinue and shall not be questioned by any of the children. The profits shall be divided equally among all the children.

"JOSEPH RUSSELL.

"I hereby revoke all former wills & appoint Anna Russell, my wife, executrix of this my last will & ask that she be allowed to act without bond.

"JOSEPH RUSSELL."

The will was admitted to probate in Silver Bow county on May 31, 1932, and Anna Russell was appointed executrix. She immediately qualified and has ever since continued to admin-ister the estate.

On May 17, 1933, the widow, Anna Russell, then executrix, filed a written renunciation by the terms of which she re-

nounced her rights under the will and elected "to take in lieu thereof my dower or legal share of the estate of my said husband."

An inventory and appraisement of the property was made and filed in the estate. From this it appears that the appraised value of the whole estate of deceased was $58,157.50. The property so appraised included 450 shares of the capital stock of the Bethlehem Steel Company, valued at $5,962.50, and 19,980 shares of the capital stock of the Joseph Russell Realty Company, valued at $52,095.

The executrix gave notice to creditors and certain claims were filed. The time within which claims might be presented expired on April 2, 1933. Within this time claims amounting to $187.50 were presented, allowed and paid. A claim for $6,831.01 was presented by one Ginter. This claim was rejected by the executrix and suit instituted thereon; apparently this suit is still pending. No other formal claims were filed in the estate matter.

The executrix did not render an account within six months in accordance with section 10288, Revised Codes of 1921; she did, however, file a verified petition for leave to sell personal property, wherein she recited the facts with reference to the administration of the estate and the progress thereof.

On May 27, 1934, one Joseph Quinn Russell, respondent herein, an adopted son of the deceased and the executrix, a person interested in the estate, filed a petition for a citation to compel the executrix to make an accounting. Citation was issued and in response thereto the executrix did, on March 2, 1934, file her first account. This account contained a recitation of the facts hereinbefore noted, as well as many other facts with relation to the estate matter. Some of these facts will be mentioned in the consideration of points hereinafter discussed. Thereafter respondent filed objections to the account and the matter came on for hearing before the court. Witnesses were sworn and much testimony was taken. At the close thereof the court took the matter under advisement and

later made a decree in the premises. In this decree the court approved generally most of the official acts of the executrix. However, it refused to approve, and did disapprove, certain other acts.

The record discloses that Joseph Russell during his lifetime was engaged in the oil business; that he owned a couple of refineries and several distributing stations, and that he organized two corporations under the laws of Montana; one was known as the Russell Realty Company, which had a capital stock of 20,000 shares, of which Russell himself owned 19,980 shares, and Mrs. Russell, his wife, owned 10 shares, and one Ludwig Renland the other 10 shares. It will thus be observed that the Russell Realty Company was a family affair, and that Russell himself was the guiding spirit thereof. This company, however, was not an active operating company but was in reality a holding company.

The Russell Oil Company was the operating company and held title to the various properties. That company had 82,400 shares of capital stock outstanding, of which 82,385 shares were owned by the realty company; the remaining 15 shares were held by Russell himself, Mrs. Russell, and Ludwig Renland. It will also be observed that this company was a family affair. The oil and refining business seemed to be the principal business of Russell and his corporations. Just why he organized these corporations and operated through them is not made clear, but we think it is fair to say that the record does disclose that the operations were all Joseph Russell operations, whether done in his own name or in the name of one or the other of the corporations.

In the course of the business, Russell executed certain promissory notes on behalf of the realty corporation. These notes he also signed himself; one of them was made to a Billings bank, and the other one to the First National Bank of Butte; both of them, however, finally found lodgment in the Butte bank. As collateral for security of the amounts men-

tioned in the notes, Russell delivered to the bank or banks the 450 shares of the Bethlehem Steel Company stock.

On June 10, 1935, the Butte bank, in order to secure payment of the amount due on the notes, sold or caused to be sold 100 shares of the Bethlehem Steel Company stock for the sum of $2,970.65. The principal and interest due on the notes amounted to $2,733.34, which, deducted from the proceeds of the stock sold, left a credit balance of $237.31.

On June 19, 1935, the executrix, pursuant to an order of court previously obtained, sold or caused to be sold 250 shares of the Bethlehem Steel Company stock for the total sum of $9,820. The remaining 100 shares of this stock were delivered to, and are now held by, a bonding or surety company as surety in connection with a bond issued to the state of Montana for the payment of the Montana state gasoline taxes due and to become due from the Russell Oil Company.

It appears that at the time of Russell's death the oil company was indebted to several individuals and corporations from which it had purchased large amounts of oil, gas and other material used by it in the course of its business. It is unnecessary to enumerate here all of the these creditors and the amount owing to each. It is sufficient to say that at the time of Russell's death the oil company was indebted to the extent of several thousand dollars. The executrix continued to operate the business, and other obligations of a similar nature were incurred and charged against the oil company. None of these obligations or debts so charged against the oil company by the different creditors were presented as claims against the estate. However, Mrs. Russell in her capacity as executrix, and in the course of the operation of the oil business, directed the proceeds derived from the sale of the Bethlehem Steel Company stock toward the payment of the debts of the oil company existing at the time of Russell's death and those subsequently incurred.

It also appears that the executrix, as widow of the deceased, collected the sum of $7,000 life insurance carried by her hus-

band on his life and of which she was the personal beneficiary. This amount was also devoted to the payment of creditors of the oil company, and a history of the transactions with relation thereto was included in the report and in the testimony in support thereof.

In the settlement of the account the court generally approved the acts of the executrix, but specifically refused to approve certain acts. It only approved the payment of claims in the sum of $187.50. These were the claims that where formally presented against the estate. The court refused to credit the executrix with the sums paid to satisfy obligations and debts incurred by the Russell Oil Company, because, as the court stated, those items related "to business transactions and dealings and obligations of the Russell Oil Company and the Joseph Russell Realty Company, and not to the affairs of said estate, and no order or direction of the court with reference to any of said matters was sought or obtained by the executrix." Specifically, the items in controversy were as follows:

(a) "Balance of the net proceeds of 100 shares of the capital stock of the Bethlehem Steel Company sold by the First National Bank of Butte, $237.31.

(b) "Net proceeds of the sale under order of court of 250 shares of the capital stock of the Bethlehem Steel Company, $9,820.00.

(c) "The net proceeds received for the remaining 100 shares of the capital stock of the Bethlehem Steel Company, if and when sold, but in no event at less than the appraised value, $1,325.00."

The court disapproved the action of the executrix in delivering the 100 shares of the Bethlehem Steel Company stock to the surety company as security for the bond in connection with the state gasoline license tax, and ordered that she repossess the same within a period of 60 days. All of the above findings were contained in the court's decree settling the account. The executrix has appealed from that decree, and urges several specifications of error. However, most of them involve the

single question of whether the court erred in refusing to credit the executrix for the sums paid out to extinguish the obligations of the Russell Oil Company.

In refusing to allow these credits, the court manifestly proceeded upon the theory that the estate of Joseph Russell, the Russell Oil Company, and the Joseph Russell Realty Company were three separate and distinct entities, and that the money belonging to the estate could not be used to discharge the obligations of either of the corporations, and that the estate could not be charged with money advanced by the executrix, the widow, personally for the purpose of paying the debts of the corporations. Such is the contention of respondent in his brief and argument before this court. For instance, in his brief he says: "We find no authority to the effect that a corporation and its majority stockholder are one and the same, and upon such a stockholder's demise, the debts of the corporation are to be paid out of the assets of his personal estate without claim for accounting."

Generally speaking, the contention thus advanced by respondent is correct. Ordinarily, in such cases the estate and the corporation must be regarded as separate and distinct entities, and the debts of the corporation in such circumstances would not constitute proper claims against the estate of the stockholder. Neither could the assets of the stockholder's estate be properly devoted to the discharge of the obligations of the corporation. However, in view of the peculiar circumstances of this case, we are of the opinion that the generally recognized principles are not applicable or controlling. As we have observed, Joseph Russell was the owner of practically all of the stock of both corporations. He was the guiding genius and the controlling power in them. It is obvious that the few shares not in his name were held by the other persons, including his wife, for the purpose of qualifying them as directors in an attempt to satisfy the legal requirements with reference to the creation and maintenance of corporate entities. The two corporations apparently existed and were used by Russell entirely

for the purpose of carrying on the personal business in which Russell was engaged. They served as mere instrumentalities through which Russell conducted his business. The corporation entities were in fact mere conveniences. The conclusion is inescapable that while there were three entities—Russell, the realty company, and the oil company—in reality Russell was the whole thing and merely created the corporations for his own personal purposes. This theory is substantiated by the fact that while the Bethlehem Steel Company stock stood in Russell's name personally, he nevertheless pledged it for corporate obligations, and, in order to do so, signed his name to the notes given the bank.

This court has not hesitated to ignore and disregard corporate entities where the ends of justice require it. The following cases are authority for such a view: *Scott* v. *Prescott*, 69 Mont. 540, 223 Pac. 490; *Barnes* v. *Smith*, 48 Mont. 309, 137 Pac. 541; *Gallatin Natural Gas Co.* v. *Public Service Commission*, 79 Mont. 269, 256 Pac. 373, 375; *Sun River Stock & Land Co.* v. *Montana Trust & Savings Bank*, 81 Mont. 222, 262 Pac. 1039. Here we think that the ends of justice require that the corporate entities of these two corporations should be disregarded to the extent that the action of the executrix in discharging the corporate debts as she did should be approved and that she should be credited for the same as requested in her account. This view is particularly emphasized by the fact that the stock in the two corporations really constituted the estate, and, of course, the stock really represented the property held in the names of the corporations. We think that the stock in the two Montana corporations and the property owned by these corporations were just as much the property of Joseph Russell during his lifetime, and his estate after his death, as was the Bethlehem Steel Company stock which technically stood in his name. If the executrix had treated both of these corporations and the estate as separate entities, she would have been unable to preserve the property and protect the rights of the estate therein. The record discloses that

a failure to pay the obligations of the oil company and to pay for supplies used in connection with the oil business would have resulted in the seizure of the property and, in that event, the entire assets of the two corporations and which in turn were actually the assets of the estate might have been entirely lost to the estate. It would indeed be a harsh rule that would penalize the executrix for attempting to prevent such a loss.

There is no merit in the suggestion that the claims against the oil company should have been presented against the estate. It must be remembered that these debts consisted solely of obligations contracted in the names of the corporations. As to these claims, the corporate entity of the corporations could not be disregarded. (See *Barnes* v. *Smith,* supra.)

It is undoubtedly true that the executrix should have appealed to the court for guidance and direction. She should have asked the court to make orders permitting her to pay off the corporate debts. Unquestionably, upon a proper showing to the court that a failure to discharge these obligations would result in the loss of the assets of the estate, the court would have entered proper orders for the protection of the executrix. However, after reading the record, we are convinced that the debts were all paid honestly, that they were justly due, and that they were paid by the executrix in entire good faith.

We are also impressed by the fact that there is no showing of insolvency on the part of the estate. Apparently the business of the oil company, which is the operating business of the whole Russell interests, was in better shape at the time of the report than it was at the time of the death of Joseph Russell.

In the light of the facts in this case, we do not feel that the law should be so rigidly enforced as to compel the court to penalize the executrix for her inadvertence in failing to obtain from the court proper direction in the administration of the estate. This conclusion may be fairly reached in view of the fact that the result obtained was so obviously beneficial to the estate, even though the proceedings by which the result was reached were not entirely in accordance with the procedure outlined by statute.

In arriving at this conclusion, we are not entirely without precedent. For example, section 10298, Revised Codes 1921, apparently contemplates a situation somewhat similar to that involved here, and makes provision therefor. Whether that section is or is not applicable or controlling here we need not decide. In any event, it exemplifies the general tendency of our law to mete out justice in this character of case, even though the statutory requirements with reference to probate proceedings have not been strictly followed. This same tendency has been reflected in previous decisions of this court. In the case of *In re Murphy's Estate*, 99 Mont. 73, 43 Pac. (2d) 230, this court approved the action of trustees created under a will whereby the trustees directed trust funds toward the protection of corporate property owned by the trust. There is no difference in principle between the situation there approved and that existing here.

We find ourselves somewhat in the condition described by the court in *Re Springer's Estate*, 79 Mont. 256, 255 Pac. 1058, 1061. There the court was confronted by a situation characterized by failure to obtain proper orders and authority in the progress of the administration of the estate. The court dealt with the matter in very apt words, as follows: "In considering the matters presented, the district court found an estate which had been conducted with little regard for the directions of the statutes. The property of the estate had been sold without an order of court and had passed into the hands of bona fide purchasers. The money received by the administrator from all sources, with the exception of a few hundred dollars, had been disbursed. Stubborn facts confronted the court: Like the noted financier, it found the 'eggs had been scrambled.' Being unable to restore the status which existed when the administration began, the court sensibly undertook to ascertain whether, despite the disregard of the statutes, the administrator had acted in good faith, and with due consideration for the rights of the creditors and the heirs; whether he had conserved the property of the estate and had not suffered

312

it to be wasted or lost through his mismanagement; whether he had acted honestly, without profit to himself, and had not caused loss to others through his act or neglect." The court, after some further discussion, said: "We agree that the settlement between Alexander, as administrator, and Springer should be approved. This results in substantial justice to all. It is regrettable that the administrator and his counsel did not follow out the directions of the statutes, but his failure to do so does not restrict the authority of the court to bring the estate to a close as justice requires."

In this case we are convinced that although the executrix did not follow strictly the directions of the statute, still she is entitled to credit for the disbursements made by her in satisfying the obligations against the corporation. She really did no more than the trustees did in the case of *In re Murphy's Estate,* supra.

Complaint is made of the court's action in ordering the executrix to repossess the 100 shares of the Bethlehem Steel Company stock now held by the surety company as security for the bond. The record is not very clear as to the reason for the conditions under which this pledge was made. We hesitate to set aside the order of the court in that respect. However, we are impressed by the fact that the district court having jurisdiction of the matter may, in the light of what we have said in connection with other features of the estate, with propriety further investigate that proposition and make some order suitable in the premises for the protection of the estate and all parties interested therein. We are impressed by the fact that the specific orders made by the court were predicated upon the theory that Russell, during his lifetime, his estate after his death, and the two corporations were separate entities. Since we have disposed of that matter, the district court should hereafter be in a position to better consider and dispose of all of the other considerations, including the disposition of the 100 shares of Bethlehem Steel Company stock now pledged with the surety company.

This court does not assume to pass upon anything other than that to which we have made specific reference, i. e., the allowance of the credits to the executrix on account of moneys expended in paying off the obligations of the corporations. Questions with reference to the construction of the will which we understand are under consideration in another action now pending, and the propriety of continuing the operation of the business through the corporations, or otherwise, are not properly before us, and we do not assume to make any decision with reference thereto.

The cause is remanded to the district court of Silver Bow county with directions so to modify the decree as to conform to the views expressed in this opinion. When so modified, the decree of settlement of the account will stand affirmed. Each side will pay his or her costs on this appeal.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES MATTHEWS, ANDERSON and MORRIS concur.

Rehearing denied July 24, 1936.