[No. 23418.   Department One.   December 28, 1931.]

# J. W. VOELLMECK, *Respondent,* v. GEORGE HARDING et al., *Appellants.*[1]

[1]Reported in 6 P. (2d) 373.

94

*Cannon, McKevitt & Fraser* and *Hamblen & Gilbert,* for appellants.

*Don F. Kizer* and *Graves, Kizer & Graves,* for respondent.

BEELER, J.—This is an action based upon fraud and deceit, brought by the plaintiff to recover the sum of $43,647.50 from the defendants Harding and wife, growing out of the sale and purchase of 2,500 shares of the capital stock of the Inland Sales Company, a domestic corporation. The cause was tried to the court and a jury, resulting in a verdict in favor of the plaintiff for the full amount sued for. The defendants' motions for judgment *non obstante veredicto,* or, in the alternative, for a new trial, were overruled, and a formal judgment was entered against the defendants, from which they have appealed.

The appellants first contend that the trial court erred in overruling their motion for a directed verdict at the close of all the evidence, and in overruling their motion for judgment n. o. v. These assignments raise the single question whether the evidence supports the verdict.

In August, 1904, August Paulsen, a wealthy financier of Spokane, Washington, and several of his business associates acquired all of the capital stock of the Consumers Company, Limited, which owned an electric plant and a water system in the city of Coeur d'Alene, Idaho. Soon thereafter, they set about to increase its

business and to improve its plants. With this purpose in mind, they secured the services of George Harding, one of the appellants, an experienced engineer, as superintendent. By reason of his devotion to duty, he was soon made general manager. Since the appellant Mrs. Harding took no part in the transactions or negotiations hereinafter detailed, she being joined as a party to the cause merely to bind the community, we shall refer to the appellant George Harding as though he were the sole party appellant.

Some time after Harding became general manager, it was deemed advisable to separate the electric business from the water system, and in 1908 a new corporation, the Kootenai Power Company, Limited, was formed and the electric system transferred to it, the shareholders of the Consumers Company receiving proportionate holdings in the power company. Hereafter, we shall refer to these two companies as the "parent companies."

In 1924, for the purpose of furthering and protecting the interests of the shareholders of the two parent companies, a third company was formed by them, the Inland Sales Company, and to it was transferred the electric appliance business, together with certain other property and interests of the two parent companies. Instead of taking all of the stock of the new company for themselves, the shareholders of the parent companies took one-half, or 5,000 shares, and permitted Harding and the respondent to acquire 2,500 shares each. The opportunity to acquire this stock was given them in appreciation of their valuable and faithful services in the past, and to insure the continuance thereof in the future. At the time the respondent purchased his 2,500 shares of stock in the Inland Sales Company, he entered into a written agreement with Paulsen that, upon ceasing to be an employee of the

parent companies, he would sell his shares *to Paulsen* at the then book value.

In January and February, 1929, two large utility companies, the Foshay Company and the Washington Water Power Company, were negotiating with Harding for the purpose of purchasing all of the corporate stock owned by the several shareholders of the three companies—the Consumers Company, the Kootenai Power Company, and the Inland Sales Company. An offer of $1,004,000 was made by the Foshay Company to Harding in January, 1929. Harding kept this valuable and exclusive information to himself. He testified: *"I did not tell anybody."* A sale was finally made to the Washington Water Power Company for $1,100,000.

Because of the strategic and dominant position Harding occupied with the shareholders and directors of the two parent companies—for over twenty years he had had charge of all their affairs unhampered by either a stockholders or directors meeting—Harding knew that, when the sale of the properties in question was consummated, the purchase price would be divided among the three companies. Of course, he could not then accurately determine in advance of the concurrence of the board of directors the exact amount which would be allocated to each of the three companies, but his faith and confidence that a substantial amount would be allocated to the Inland Sales Company is evidenced by the fact that, when the officers of the Washington Water Power Company in the early part of February, 1929, sought information as to how the purchase price would be distributed among the three companies, he informed them that twenty-five per cent of the purchase price would go to the Inland Sales Company, and the balance thereof divided between the two parent companies. On this basis, if the sale were made for $1,000,000, the Inland Sales Company would

receive $250,000, which would make the respondent's 2,500 shares of stock worth $62,500.

It may be said parenthetically that 17.69 per cent of the sale price, $1,100,000, was ultimately allocated to the Inland Sales Company. On this basis, respondent's shares of stock were worth slightly in excess of $50,000. Still a nice prize.

Realizing that the sale of the properties of the three affiliated companies was imminent, and that a substantial part of the purchase price would be paid to the shareholders of the Inland Sales Company—Harding at that time still believed that twenty-five per cent would go to that company—Harding determined to secure *for himself* the 2,500 shares owned by the respondent. Prompted by this scheming and selfish thought, and fortified by his intimate knowledge of the existing conditions and the bright prospects of sale, Harding had an interview with the respondent at Spokane, Washington, on February 13 and 14, 1929, and insisted on an immediate sale *to him* of respondent's 2,500 shares of stock at their book value, $7,500. What was said, represented, or withheld at this and previous interviews between the two principals, as detailed by the testimony of the respondent, upon which the jury undoubtedly predicated their verdict, is, in substance, as follows:

In January, 1929, Harding told the respondent there was a likelihood of a sale of the three affiliated companies, and mentioned the names of prospective purchasers. In February following, respondent visited Harding's office in Spokane on routine business, and the latter asked him if he would sell his stock for $7,500, to which he promptly answered in the negative. Thereupon, Harding stated that the properties would undoubtedly be sold, and that the purchase price would

be so divided that the shareholders of the Inland Sales Company would receive *only* the book value of their stock, namely, $30,000, *making respondent's stock worth but $7,500.* Still the respondent refused to sell at the figure quoted. Harding then said that it was the desire of the shareholders of the two parent companies that the sale be made, and reminded him that they had the power to discharge him at any time and acquire his stock at its book value. Harding stressed the fact that he was acting for the dominant shareholders and was compelled, himself, to submit to similar terms for his own stock in the Inland Sales Company.

After further consideration, and moved by the fraudulent and deceitful representations and statements made by Harding, in whom the respondent then had implicit confidence, he agreed to accept $7,500. The contract of sale was drawn by Harding, dated February 14, 1929. It provided for an initial payment of twenty-five dollars and the placing of the stock in escrow, and for the transfer and delivery of the stock to Harding as soon as the balance of the $7,500 was paid. In due course, the sale of the stock of the three affiliated companies to the Washington Water Power Company was consummated, and the balance due the respondent paid to the escrow holder and his stock was delivered to Harding on April 29, 1929.

While there are many other facts and circumstances that might be detailed, we are satisfied that the foregoing is sufficient to show that the verdict of the jury is abundantly supported by the evidence, and that the trial court properly overruled both of appellants' motions.

The remaining four assignments of error relate to the giving and to the refusal to give certain instructions.

The appellants earnestly contend that, even conceding that the representations made by Harding were untrue and were relied on by the respondent to his prejudice, nevertheless the statements do not support an action for fraud and deceit, for the reason that the respondent had the means and opportunity of ascertaining the truth before irrevocably committing himself to the sale of his stock, and further contend that the trial court erred in giving a portion of instruction No. 1, and in refusing to give instruction No. 10 requested by appellants. The substance of this contention is that the respondent had no right to rely upon the representations made by Harding, but was bound to make an independent investigation to determine whether the representations were true or false.

A determination of this issue necessitates an examination into the relationship that existed between Harding and the directors and stockholders of the three affiliated companies on the one hand, and the relationship between Harding and the respondent on the other hand.

We have already noted that the officers and stockholders of the three affiliated companies had given Harding full and complete domination and control over their affairs. In fact, Harding exercised a commercial dictatorship for upwards of twenty years over the two parent companies, and from 1924 over the three companies. Neither the directors nor the shareholders ever questioned his acts. The stockholders were interested only in results, the dividends earned and paid, and these were more than satisfactory.

As to the respondent, it appears that he was first employed by Harding for the utility companies in a minor capacity. This was in 1908. He was then twenty-two years old, and for a period of twenty-one

years served loyally and faithfully. He was steadily advanced until, in 1917, he was appointed office manager, and, in 1921, superintendent of both of the parent companies. Harding was his benefactor, counsellor, master and friend, with plenary power to advance or to discharge him. Under the relationship that existed between Harding and the respondent, it would be preposterous to say that these men dealt at arms length when the sale of respondent's stock was negotiated. Like Paul sitting at the feet of Gamaliel—the humble disciple and the inspired sage—the respondent looked to Harding for guidance, and had a firm confidence in his honesty and integrity.

Nor was their means of knowledge the same. Harding enjoyed to a superlative degree the confidence of the stockholders and directors. Harding was a stockholder and a director in each of the three affiliated companies, as well as vice-president of the Inland Sales Company. He was not only inside the Sanhedrin, but was the High Priest thereof, and knew and could foresee in advance every important move. The most important of these was the allocation to the shareholders of the Inland Sales Company of a substantial portion of the purchase price derived from the sale of the three affiliated companies to the Washington Water Power Company. Under such circumstances, the rule contended for by the appellants that the respondent was bound to make an independent investigation as to the statements and things told to him by Harding has no application.

While ordinarily a director of a corporation does not occupy a fiduciary relation to a stockholder, yet, under the circumstances of the instant case, such relationship did exist between Harding and the respondent. The supreme court of the United States in *Strong v. Repide,* 213 U. S. 419, had before it the ques-

tion whether a fiduciary relation existed between a director and a shareholder, under facts and circumstances in many respects similar to those of the case here under consideration. There, a company owned lands in the Philippine Islands, and one of its directors entered into negotiations to sell the lands to the United States government. By reason of the negotiations, he learned the amount the government would be likely to pay. The director, acting through an agent for the purpose of concealing his identity, and without imparting to the stockholder the probability of a sale, purchased the shareholder's stock at a price much less than its value in the event of sale. Passing on the question whether the relationship between the director and shareholder was of a fiduciary character, that court said:

"If it were conceded, for the purpose of the argument, that the ordinary relations between directors and shareholders in a business corporation are not of such a fiduciary nature as to make it the duty of a director to disclose to a shareholder the general knowledge which he may possess regarding the value of the shares of the company before he purchases any from a shareholder, yet there are cases where, by reason of the special facts, such duty exists. . . . It is here sought to make defendant responsible for his actions, not alone and simply in his character as a director, but because, in consideration of all the existing circumstances above detailed, it became the duty of the defendant, acting in good faith, to state the facts before making the purchase. That the defendant was a director of the corporation is but one of the facts upon which the liability is asserted, the existence of all the others in addition making such a combination as rendered it the plain duty of the defendant to speak. He was not only a director, but he owned three-fourths of the shares of its stock, and was, at the time of the purchase of the stock, administrator general of the company, with large powers, and engaged in the nego-

tiations which finally led to the sale of the company's lands (together with all the other friar lands) to the government at a price which very greatly enhanced the value of the stock. He was the chief negotiator for the sale of all the lands, and was acting substantially as the agent of the shareholders of his company by reason of his ownership of the shares of stock in the corporation and by the acquiescence of all the other stockholders, and the negotiations were for the sale of the whole of the property of the company. By reason of such ownership and agency, and his participation as such owner and agent in the negotiations then going on, no one knew as well as he the exact condition of such negotiations. No one knew as well as he the probability of the sale of the lands to the government. No one knew as well as he the probable price that might be obtained on such sale. The lands were the only valuable asset owned by the company. Under these circumstances and before the negotiations for the sale were completed the defendant employs an agent to purchase the stock, and conceals from the plaintiff's agent his own identity and his knowledge of the state of the negotiations and their probable result, with which he was familiar as the agent of the shareholders and much of which knowledge he obtained while acting as such agent and by reason thereof. The inference is inevitable that at this time he had concluded to press the negotiations for a sale of the lands to a successful conclusion, else why should he desire to purchase more shares which, if no sale went through, were, in his opinion, worthless, because of the failure of the government to properly protect the lands in the hands of their then owners.''

In February, 1929, Harding was negotiating with the respondent for the purchase of his 2,500 shares. He knew that one of the prospective purchasers had offered $1,003,000 for the stock of the three affiliated companies. Harding believed that twenty-five per cent of the purchase price would be allocated to the Inland Sales Company. He knew that respondent was unin-

formed as to all these facts and circumstances, and yet he designedly and cautiously withheld them from him.

We are satisfied that the relationship existing between Harding and the respondent, under all the circumstances of this case, was of a confidential or fiduciary character, and that the latter had the right to rely on the representations made to him by Harding.

"A good deal has been said as to what constitutes a *confidential relation* within the operation of the principle, but Courts have always been careful not to fetter the operation of the principle by undertaking to define its precise limits. The cases of parent and child, guardian and ward, trustee and *cestui que trust,* principal and agent, are familiar instances in which the principle applies in its strictest sense. But its operation is not confined to the dealings and transactions between parties standing in these relations, but extends to all relations in which confidence is reposed, and in which dominion and influence resulting from such confidence, may be exercised by one person over another. No part of the jurisdiction of the Court is more useful, it has been said, that that which it exercises in watching and controlling transactions between parties standing in a relation of confidence to each other. And being founded on the principle of correcting abuses of confidence, it ought to be applied to every case in which a confidential relation exists as a fact—where confidence is reposed on one side, and the resulting superiority and influence on the other." *Zimmerman v. Bitner,* 79 Md. 115, 28 Atl. 820.

The appellants next contend that the court erred in refusing to give instruction No. 12, which was to the effect that the respondent could not recover if, before he received the final payment on April 29, 1929, he learned, or by the use of ordinary diligence should have learned, of the fraud perpetrated against him. They argue that, if the respondent knew, or in the exercise of ordinary precaution could have discovered, the deception practiced upon him by Harding, he should

have brought an action to rescind, and that the respondent could not confirm the contract and sue for damages.

This would undoubtedly be true if the contract in question had been wholly executory. *Jacobson v. Nicholas,* 155 Wash. 234, 283 Pac. 684. The rule is otherwise, however, where the contract is partially or fully executed. Under such circumstances, the aggrieved party has an election to rescind or affirm the contract and sue for damages. *Harris v. Egger,* 226 Fed. 389; *McCabe v. Kelleher,* 90 Ore. 45, 175 Pac. 608; *McDonough v. Williams,* 77 Ark. 261, 92 S. W. 783, 8 L. R. A. (N. S.) 452.

Harding prevailed on the respondent to sign the contract for the sale of his stock on February 14, 1929. Under the contract, the stock was placed in escrow to be delivered to Harding at such time as he paid the full purchase price. These conditions were later complied with, and thereupon the control of the stock passed from the respondent to Harding. So far as the respondent was concerned, the contract between the parties was fully executed. There was nothing further for him to do. Control of the final delivery had passed from him. *Bronx Inv. Co. v. National Bank of Commerce,* 47 Wash. 566, 92 Pac. 380; *Adams v. Harris,* 118 Wash. 189, 203 Pac. 48.

Error is next assigned upon the instructions relating to the measure of damages. Harding took the position throughout the trial that the difference between the *book value* of the shares in question, and the sum allotted to them from the purchase price of the affiliated companies, was intended as a *reward* or *bonus* to *him* for his extraordinary and faithful services.

It is sufficient to say that the jury was instructed on this theory of the case. The instructions on that issue were concise and to the point. In instruction No. 2,

the jury was told in unmistakable language that if they found

" . . . that the amount which the defendant Harding received for the stock in the Inland Sales Company which plaintiff [respondent here] agreed to sell to him under the terms of said agreement of sale, over and above the book value of said stock, was allocated or allotted by the stockholders of the Consumers Company, Limited, and the Kootenai Power Company, Limited, to the Inland Sales Company for the purpose of rewarding and compensating the defendant George Harding for his services and not on account of the value of said stock, then the plaintiff has not been damaged and your verdict must be for the defendant.''

On the other hand, the jury were told that, if they found this was not the fact, but that the respondent had been deceived and defrauded by Harding, they should return a verdict against him and in favor of the respondent in the sum of $43,647.50, together with interest thereon at the rate of six per cent per annum from the first day of May, 1929. This sum represents the difference between the amount the respondent received and what he would have received from the sale of his stock but for the fraudulent misrepresentations made by Harding. This was a correct statement of the law relating to the measure of damages.

The rule is well stated in the case of *Staker v. Reese*, 82 W. Va. 764, 97 S. E. 641, where the facts and circumstances in many respects are similar to those here under consideration. It was there said:

"The rule for measuring damages in such cases as this, as in fact it is in all cases where compensatory damages are sought, is that the party injured should be made whole. The law does not contemplate that one who procures a bargain by fraud shall benefit thereby, but that one who has been defrauded of his property shall be compensated by the party who defrauds him

to the extent of complete satisfaction. In other words, he is entitled to recover in a case like this, where the property is stock in a corporation which has been wound up, what he would have received had not his stock fraudulently been taken away from him.''

To the same effect see *Frederick v. Brainard*, 32 Idaho 296, 182 Pac. 351.

We applied the same rule in *Lawson v. Vernon*, 38 Wash. 422, 80 Pac. 559, 107 Am. St. 880. We there said:

''In this case as in all others, the recovery should be commensurate with the injury; that is to say, the guilty party is to be charged with such damages as have naturally and proximately resulted from his wrongful act.''

The judgment is affirmed.

TOLMAN, C. J., MITCHELL, PARKER, and HERMAN, JJ., concur.