[No. 24494. Department Two. September 15, 1933.]

SARAH M. McCURDY *et al., Respondents,* v. SPOKANE
WESTERN POWER AND TRACTION COMPANY *et al.,*
*Appellants.*[1]

*John E. Blair,* for appellants.

*Cannon, McKevitt & Fraser, Dilley & Dilley,* and
*Fred M. Williams,* for respondents.

[1]Reported in 24 P. (2d) 1075.

STEINERT, J.—Plaintiffs brought this action (1) to set aside the transfer of corporate stock formerly owned and held by them, alleging in their complaint that the transfer was effected through the conspiracy of certain officers of a corporation to defraud plaintiffs of their proportionate interests in the corporate assets represented by the stock; (2) to have a receiver appointed for the corporation; and (3) to compel an accounting of the funds derived from the sale of the corporate assets. The cause was tried before the court without a jury, resulting in a judgment for the plaintiffs, from which the defendants have appealed.

The transactions complained of and alleged to have been the outgrowth of a conspiracy, cover a period of about twenty-three years, that is, from 1906 to 1929. A diffusive mass of details was presented to the trial court by the evidence on both sides. The story as a whole is told in a statement of facts of over a thousand pages, augmented by two hundred and eighty-two exhibits, consisting of depositions, affidavits, corporate records, contracts, conveyances, court proceedings, files of correspondence, accountants' computations and miscellaneous instruments. Our statement of the case and our discussion of the issues must necessarily be within a more restricted limit than that encompassed by the briefs.

There are three distinct periods under which the essential facts of the case classify themselves. They are as follows: (1) from the time of the organization of Spokane Western Power and Traction Company, a corporation, in 1906 to the organization of Spokane Valley Power Company, a corporation, in 1913; (2) from the time of the organization of the latter company in 1913 to and including the year 1918; and (3) from the end of 1918 to the commencement of this action in 1929.

The two principal characters connected with the early history of these transactions were H. S. Stoolfire and Scott E. McCurdy, both of whom are now dead. These two men were friends and business associates. The litigation is now waged between the members of the McCurdy family on the one side and the widow of Mr. Stoolfire and executrix of his estate, together with some of his former associates in the projects hereinafter mentioned, on the other side.

Spokane Western Power and Traction Company, which will hereinafter be referred to as "the traction company," was organized as a corporation on February 24, 1906. The objects for which it was formed included, among other things, the location, construction, acquisition, operation and disposal of water rights and power plants for generating electricity, railroads, and all kinds of real estate. Mr. Stoolfire was one of the five original trustees of the company. At a meeting held June 1, 1906, Mr. McCurdy was made a trustee, and at the same meeting Mr. McCurdy and Mr. Stoolfire were elected vice-president and secretary, respectively.

On July 17, 1906, Mr. McCurdy made an offer to transfer to the traction company certain rights, franchises and properties of Spokane Valley Railroad Corporation, of which he was then president, and also certain lands, water rights and privileges owned by him in connection therewith, for a consideration of 22,495 shares of common stock of the traction company. This offer was accepted, and deeds conveying the property were executed. The property thus conveyed has an important bearing upon the subsequent dispute with which we are here concerned, inasmuch as it included certain flowage rights, a railroad and railroad right of way and also a smelter, to which we will later refer.

These properties had, in the minds of the parties, great value. But such value, whatever it was, was almost entirely speculative, dependent upon the expectant ability of Mr. Stoolfire either to develop them or else to dispose of them to parties who might be desirous of obtaining them because of their strategic importance and prospective value.

The record does not satisfactorily disclose how Mr. Stoolfire acquired his stock in the traction company, but for the purpose of this case we are assuming that he did not pay for it in cash, but rather in services rendered by him to that company. The record does disclose, however, that, as early as May 11, 1908, Mr. Stoolfire held 15,401 shares, and that Mr. McCurdy's stock had been reduced to 14,495 shares, making in all 29,896 shares of the total issued capital stock of 30,-000 shares. From that time on, their relative stock holdings remained unchanged.

Going back now a step, in point of time, it appears that, shortly after its organization, the traction company had, on September 29, 1906, borrowed from one D. P. Jenkins the sum of $53,077, evidencing the loan by the company's note due in one year from date and bearing interest at the rate of eight per cent per annum. The note was secured by a mortgage covering about four hundred acres of land along the banks of the Spokane river, together with all appurtenances thereto, the same being property which Mr. McCurdy had originally conveyed, or caused to be conveyed, to the traction company. On September 19, 1907, ten days prior to the maturity of the Jenkins note, Mr. McCurdy, who at that time, and thereafter until his death, resided in Grand Rapids, Michigan, met Mr. Stoolfire at Chicago, Illinois, and there entered into an option agreement with Mr. Stoolfire with reference

to the McCurdy stock. Because of its important bearing upon the issues in this case, we quote the agreement here in full:

"S. E. McCurdy, of Grand Rapids, Michigan, the first party, contracts and agrees with H. S. Stoolfire, of Spokane, Washington, the second party, as follows, to wit:

"Whereas, the first party is the owner of and agrees to option and sell to the second party and his associates, about 13,000 shares or all of his holdings in stock in the Spokane Western Power & Traction Company, except 1,000 shares reserved to himself and

"Whereas, the said company has a mortgage indebtedness on its property situated in Spokane County, State of Washington, of about $53,000. dated on or Sept. 29th, 1906, payable one year after date and bearing 8 per cent interest, and the second party and his associates have agreed and shall advance money on account and towards the payment of the said mortgage, the said mortgage to be assigned and continued in force in favor of the second party and his associates contributing towards its payment.

"That for and on consideration of One Dollar and mutual considerations, the first party agrees to sell and transfer to the second party and his associates all of the said 13,000 shares of said stock at the rate of $3.02½ per share at any time in the future while the said second party and his associates shall be required or find it necessary to carry or provide for the payment of the said mortgage, or so long as the second party and his associates shall finance or carry all, or any part thereof, and during such time as the said mortgage remains unpaid or any part thereof in the hands of the second party or his assigns and associates the said price and option shall continue in his and their favor.

"It is further agreed and understood that the second party stands in the relation of a trustee towards all parties contributing towards the payment and purchase of the said mortgage as to all or any part thereof.

"Dated at Chicago, Illinois, this 19th day of September, 1907.        S. E. McCurdy

"H. S. Stoolfire

"We, the undersigned, as beneficiaries, under a certain contract made by and between said S. E. McCurdy and F. O. Adams, under the date of on or about Sept. 21st, 1906, do hereby consent and agree to the above and foregoing stipulations and accept the terms and conditions thereof, as a supplement to the said original contract of September 21st, 1906.

"H. S. Stoolfire

"F. O. Adams

"By H. S. Stoolfire

"His Attorney In Fact."

It will be observed that it was the intent of the parties, as appears from the option agreement, that Mr. Stoolfire and his associates were to advance moneys on account and towards the payment of the mortgage; that the mortgage was to be assigned and continued in force as security to Mr. Stoolfire and his associates for such advances; and that Mr. Stoolfire should stand as trustee for those who contributed with him in such advances.

Now, it is conceded by all parties that, from the time of the organization of the traction company and throughout the first period of these transactions, that is, down to about August 8, 1913, Mr. Stoolfire was the active, controlling and, we might say, the dominating personality of the traction company and its affairs. Mr. McCurdy was in Michigan, and, having full confidence in Mr. Stoolfire's ability and integrity, was disposed to leave the entire matter, including his own interests, to the latter's management and care. Correspondence between the two men reveals the fact that Mr. McCurdy was perfectly willing to, and did, give full rein to Mr. Stoolfire to proceed with all phases of the venture and enterprise as he saw fit and according

to his best judgment. Under this arrangement, harmonious in every respect, Mr. Stoolfire devoted practically his entire time to the promotion of the traction company's interests, with the view of developing its possibilities, and particularly with the idea of ultimately disposing of its properties as opportunity should afford.

There was a great deal of railroad activity in the Pacific Northwest during the early part of this period, and both Mr. McCurdy and Mr. Stoolfire felt that, because the lands of the traction company lay in a strategic position, they would command the attention and excite the interest of those who were particularly interested in the projection and construction of railroads. Throughout the entire period, Mr. Stoolfire was negotiating, or endeavoring to negotiate, with various railroad and electric companies for the sale of rights of way to them, or else for such connections with them as would permit the traction company to obtain trackage and terminal facilities for its own prospective railroad construction. Among such companies were the Chicago, Milwaukee & St. Paul Railroad Company, the Great Northern Railway Company, O. W. R. & N. Company, Spokane & British Columbia Railroad Company, Okanogan Electric Railway Company and others. The other possibilities of the traction company, Mr. Stoolfire was likewise endeavoring to promote.

These attempts to sell the properties, or portions of them, had varying degrees of hopeful prospect, but, unfortunately, none of them ever developed to a satisfactory conclusion. Failure, in some instances at least, was due to the fact that Mr. Stoolfire was thought to be holding the properties at excessively high figures. He was evidently trying to get all that he could for what the company had to sell, and what

he thought the properties were worth. Mr. McCurdy was continuously advised of what was being done, and always expressed his satisfaction, accompanied with the hope on his part that success would ultimately crown Mr. Stoolfire's efforts.

In the midst of these various negotiations, Mr. McCurdy died on November 4, 1911. Thereafter, Mr. Stoolfire continued his correspondence with the respondent R. S. McCurdy, the son of Scott E. McCurdy. The son, it appears, had been living with, or near, his father at Grand Rapids, and was more or less familiar with the previous correspondence. He had, in fact, written a number of the letters which his father had sent to Mr. Stoolfire.

In the meantime, while these various negotiations and endeavors were pending and proceeding, the traction company had not been functioning as a productive concern, except possibly with respect to the smelter, above referred to, which may have produced some slight, though insignificant, returns. On the other hand, expenses were accruing and mounting. The Jenkins mortgage, which in the meantime had been assigned to the Union Trust Company, was a constant and disquieting burden.

Mr. Stoolfire, pursuant to the terms of the above option agreement, had from time to time procured necessary funds from various parties, including some of his relatives and the appellant Rhodehamel, and was applying the funds on the Jenkins mortgage and its growing interest charges, and also on taxes, which likewise were a recurrent burden. These advances, together with interest thereon, were entered on the books of the company as a credit in favor of H. S. Stoolfire and H. S. Stoolfire, Trustee, according to the sources from which they had been obtained. In addition to this, Mr. Stoolfire was charging the company

for services rendered by him in connection with the company's affairs, totaling in amount about fifteen thousand dollars. He also charged against the company the expenses incurred by him. Inasmuch as the company had no funds or income except as procured from the advances made, Mr. Stoolfire received no money for the items charged, at least not sufficient to pay them in full. They were, for the most part, merely credits in his favor on the books of the company.

Such was the condition of affairs in August, 1913. At that time, Mr. Stoolfire and his associates had advanced to the traction company, for payment on the principal of the Jenkins mortgage, $18,077; for interest, $21,085.90; and for taxes, $1,133.34; making a total of $40,296.24 advanced for these three items. There was still unpaid on the principal of the Jenkins mortgage the sum of $35,000. The books show that there was then owing to Mr. Stoolfire on his personal account a total of $47,288.24, and to him as trustee, $23,171.33; or a total of $70,459.57, for advances of money and for services and expenses. There may be some inaccuracies in this latter amount, owing to the method of bookkeeping. It was, in any event, greatly in excess of $22,500, an amount which becomes of some importance in our later discussion.

The respondents allege in their complaint that Mr. Stoolfire and certain of his associates had, from the very beginning, conspired and cooperated to work the ultimate destruction of the properties of the traction company so that they might be acquired by them for little or nothing. In his oral opinion, given at the conclusion of the evidence, the trial judge stated that he did not believe that there was any warrant for holding that there was any conspiracy or any attempt to defraud Mr. McCurdy or these plaintiffs during the

period of time to which we have just referred; that is, from 1906 to 1913. Our reading of the record convinces us that the court was correct in that conclusion. We have not been able to find anything which in any way reflected upon Mr. Stoolfire's integrity, candor or fairness in any particular, during that period.

We now come to the second period of time, extending from August 8, 1913, to the latter part of the year 1918. This period begins with the organization of another corporation known as Spokane Valley Power Company, which we will hereinafter designate as "the valley company." It will be remembered that, at this time, the traction company was laboring under an exceedingly heavy indebtedness, a large part of which was owing to Mr. Stoolfire, either individually or as trustee. On account of this load of indebtedness, it was almost impossible to interest any other property owners along the Spokane river in any joint power enterprise which the traction company might have contemplated, and the traction company was unable to function alone along that line.

With this situation obtaining, Mr. Stoolfire proposed to take over certain of the properties of the traction company adapted to power development, and to pay for them by allowing a proper credit against the amount owing to him by the latter company. The proposal was formally accepted by the trustees of the traction company. At that time, it will be borne in mind, Scott E. McCurdy was dead, and none of his family were officers or trustees of the traction company, but merely stockholders.

In pursuance of the plan conceived by Mr. Stoolfire, the valley company was organized in August, 1913, and Mr. Stoolfire became the owner of 1,995 shares, out of a total of 2,000 shares, of its capital stock. The valley company was formed specifically for the purpose

of developing water power and electric facilities. Throughout its career, Mr. Stoolfire was, until his death in 1928, its motivating spirit and dominant factor.

Pursuant to the organization of the valley company, the traction company conveyed to it, by various deeds, certain described real estate, together with all flowage rights, water rights and water power incident and appurtenant to such real estate and to other real estate which the traction company still retained. All of the properties so conveyed had been originally conveyed, or caused to be conveyed, to the traction company by Scott E. McCurdy. It is to be kept in mind, however, that the traction company still retained a large part of its properties, viz., real estate, a railroad, rights of way, and a smelter, which were not included in the conveyances to the valley company. These, it reasonably appears, constituted the most valuable portions of the traction company's original properties.

The conveyances to the valley company were made in consideration of a credit of $22,150 on the indebtedness owing by the traction company to Mr. Stoolfire. No contention is made that the amount of the consideration was an inadequate price for the property so conveyed. There is also no question that, at the time of the transfer, the widest general publicity was given to the formation of the new company and to its proposed projects.

The McCurdys, however, contend that they never heard of the formation of the valley company or of the conveyances to it by the traction company. Mr. Stoolfire being dead, we, of course, do not have his side of the story in that respect. The correspondence contains no specific reference to the new company, although there are many general references and statements from which the matter is one of reasonable in-

ference. The fact that they were not specifically advised of the transfer and the fact that all that the traction company received therefor was a reduction in its indebtedness to Mr. Stoolfire, are the two complaints made by the respondents upon this phase of the case.

We have already referred to the option agreement between Scott E. McCurdy and Mr. Stoolfire. Under the agreement, the price of the stock was fixed at $3.02½ per share, or a total amount of $39,325. Prior to Mr. McCurdy's death, there was some correspondence between him and Mr. Stoolfire wherein a reduction in the option price was discussed. After his death, and proceeding along the line of the prior correspondence, the respondents McCurdy executed a supplemental option agreement dated July 8, 1913, extending the option for one year, reducing and fixing the sale price of the stock to, and in, the sum of $17,394, and continuing all the other terms of the original agreement in full force. Thereafter, the option was extended from year to year until 1918, when it expired.

Throughout the entire time of this second period, Mr. Stoolfire continued his activities in connection with both the traction company and the valley company in the same manner as he had previously done in connection with the traction company alone. He gave the two companies his entire time. The negotiations with the various railroads to which we have already referred were not neglected, but were energetically and vigorously prosecuted, in the hope of realizing upon some of them. At the same time, Mr. Stoolfire endeavored to promote the projects of the valley company. The World War having broken out in the meantime, it was thought that the occasion would afford the opportunity of developing electrolytic zinc processes,

and considerable effort was made toward that end. The properties of the two companies were of such nature and contiguity that the development of those of the one was almost certain to enhance the possibilities and value of those of the other.

The unfortunate thing about the whole matter, however, was that Mr. Stoolfire was never able to consummate any of his negotiations or to realize upon any of the dreams entertained by the parties. Added to this was the misfortune that the smelter, located on the traction company's lands, burned on June 19, 1918, and became totally valueless, except for a salvage of $2,014.23. During July and August, 1918, the rails of the traction company's railroad, which was no longer being used, were taken up and sold for $17,840.95. Of the $19,855.18 received from the sale of the rails and the salvage of the smelter, $10,000 was paid on the Jenkins mortgage and the balance was apparently retained by Mr. Stoolfire and charged against him on the books of the company under his account.

During all of this time, the McCurdys were constantly kept informed of the condition of affairs, particularly of the fact that the traction company, by reason of its mounting indebtedness, was falling into desperate circumstances. On June 19, 1918, Mr. Stoolfire wrote to R. S. McCurdy advising him that the burning of the smelter would probably precipitate the foreclosure of the Jenkins mortgage; further, asking Mr. McCurdy to come to Spokane to attend a meeting of the stockholders of the traction company to be held sometime in July for the purpose of determining what policy the company should pursue under the existing conditions. The letter particularly stressed the fact that Mr. Stoolfire wanted Mr. McCurdy to know what had been done toward furthering the development of the traction company's interests and to understand all

the existing conditions. Mr. McCurdy answered this letter by wire, stating that he personally could not come to Spokane, but that he would have Mr. Edgar Van Osdel attend. Mr. Van Osdel was a friend of the McCurdy family, and had been associated with the elder McCurdy in the operation of Spokane Valley Railroad Corporation.

Mr. Stoolfire then corresponded with Mr. Van Osdel, and on July 31, 1918, the latter came to Spokane and was given complete access to the books and records, which he then examined. He also made a personal inspection of the properties. After examining the books and properties, Mr. Van Osdel wrote to Mr. McCurdy, telling him what he had learned. Inasmuch as this letter has a very important bearing upon respondents' contention that they had no knowledge of the conditions until they commenced this action, we quote it in full as follows:

"Dear friend Roy: 31 July 1918.
"I have spent all day with Stoolfire and learned much that I did not know but nothing hopeful. In fact the thing is in worse shape than I supposed.

"I did not know that Adams squandered all the $50,000 borrowed from Jenkins except 10,000 to Roberson. Nor that the mortgage was made for $53,077 and only $50,000 paid over. I understand $18,077 has been paid on the mortgage and that Stoolfire, Willard and others have paid the interest and taxes for 10 years amounting to about $42,000. I understand you folks were paid $10,500 and that $15,000 for technical work and advice has been expended. Stoolfire claims he has $28,000 in and his friends a much larger sum so that the total indebtedness of the company is about $125,-000 (figuring compound interest). I cant find out just how much cash has been put in. Now they have stopped putting up money and have defaulted the July payment of interest on the mortgage of $1400. The YMCA, who hold the mortgage and the Trust Co. who handle it will bring suit to foreclose because they

know Stoolfire has so much money in that he must bid it in at a price which will give them their $35,000. Of course they will not talk business now but when suit is brought he *hopes* to get them to take a part payment, and reduced interest (5% instead of 8%). Stoolfire seems to have been working under an agreement with your father that moneys put up should draw the same interest as the mortgage but be subrogated to it and the company has given notes for these sums advanced.

"Of course it is entirely unfair that loan money should take precedence over money represented by stock yet such is the law.

"Stoolfire thinks nothing can be done until it is in the courts and then expects to be able to work out some kind of a deal and later a reorganization.

"It is a terrible mess and would take one a month to go to the bottom of, and when you got in, I don't know of any advantage it would be.

"Under the agreement regarding these loans to the company, they have the 'cinch' and money represented by stock will get nothing—except as a free gift. I tried to make Stoolfire feel a responsibility to get you some money and I think he would like to but there is no ray of hope. Deals with the Hercules people and the Bunker Hill and Sullivan people both fell through by railroad manipulation and there is no possible buyer or any one likely to be interested in any part of the enterprise. The fire has just about finished the possible use of anything down there and to make a ferromanganese plant or anything else requires fresh blood and there is none. It all is a terrible indictment of selfishness—James Walker, J. R. Roberson, O. A. Dunphy, F. O. Adams.

"Now—Stoolfire wants an outside attorney to make answer for the company or for you and call attention to the $3,077 which was never paid on the mortgage. This he thinks will help to arrange settlement. He wants you to write the man whose address is enclosed, asking him if he will act. He is in the same offices with Stoolfire which looks bad in court but he knows him to be trustworthy and not liable to spoil the deal.

Stoolfire wants to have no attorneys fees in the court settlement and the Trust Co. have agreed to that.

"I have gone over so much that I am muddled but by the time I get back here from this trip may have some ideas. Will write again in a day or two—perhaps you better write the lawyer at once.

"Faithfully,
"E. B. V. O."

A few days later, Mr. Van Osdel wrote a second letter, which contained no additional information, but did refer to the fact that Stoolfire had made advances to the traction company. After receipt of these letters, none of the McCurdys ever came to Spokane or took any active interest whatever in the affairs of the corporation other than by subsequent correspondence. Mr. Stoolfire was left to proceed as before.

This brings us down to the end of the second period, which was in the latter part of 1918. At that time, according to the books and records of the traction company, Mr. Stoolfire and his associates had advanced and paid on the Jenkins mortgage, then owned by the YMCA through assignment, the sum of $18,077 on principal and $33,685.90 on interest, a total of $51,762.90. Interest on these advances amounted to the additional sum of $31,488.68; taxes paid to that date amounted to $2,250.60; or a grand total of $85,502.18.

Throughout this period, one H. S. Willard had been Mr. Stoolfire's principal source of money supply. The amounts advanced by him were charged on the books as a credit to H. S. Stoolfire, Trustee. On June 6, 1917, evidently pursuant to the urgent demands of Willard, the company executed its note to the latter in the sum of $88,148.56. This note seems to have replaced two outstanding notes of the traction company, one of which had run to Mr. Stoolfire individually, and the other to him as trustee. There still remained owing on the Jenkins mortgage the sum of $25,000.

In setting forth the indebtedness at the end of this period, we are not including anything charged against the company for services rendered or expenses paid by Mr. Stoolfire. That indebtedness had probably been balanced by the conveyance to the valley company in 1913 of the properties that we have already mentioned, for the consideration of $22,500 charged against Mr. Stoolfire.

In his oral opinion rendered at the conclusion of the evidence, the trial judge stated that

"Mr. Van Osdel was given complete access to the books of the traction company, from which he could, and possibly did, learn of the conveyance of the property from the traction company to Mr. Stoolfire back in 1913, and also of the existence of the Spokane Valley Company."

The court further said that

"If there could be any possible inference or intention on the part of Stoolfire to conceal those facts from the McCurdys, that they did have the means in 1918 to discover those facts, so that anything that transpired prior to 1918, in my opinion, is not the basis for the action, or a judgment in this case in favor of the plaintiffs."

Our reading of the record convinces us that the trial court was entirely correct in those observations. Our view, however, may be expressed in somewhat more determinative language. We think that respondents are not only estopped from basing any action on occurrences prior to 1918, by reason of their knowledge, or means of knowledge, of the facts, but, further, that the actions of Mr. Stoolfire up to that time furnish no basis for this action at all.

We now come to the third, and final, period, from 1918 to the time of the commencement of this action in 1929. This period has no particular landmark indicat-

ing an abrupt change from the events of the preceding period. The affairs of the traction company were at a standstill, and the outlook worse. There was no prospect of moving the property by sale, or enhancing it by development. All endeavors had been fruitless, and hope was well-nigh spent. Even the correspondence between the parties, which theretofore had been merely the harbinger of bad news, dropped to an occasional letter. The McCurdys seemed to have become discouraged, although they never expressed any criticism whatever concerning anything that Mr. Stoolfire had done. They still retained some hope that Mr. Stoolfire might eventually do something which would realize a return for them, even though slight, upon their stock, the option on which, held by Mr. Stoolfire, had expired in 1918.

The first letter from Mr. McCurdy to Mr. Stoolfire during this period is of date March 12, 1923, in which an inquiry concerning conditions was made. Mr. Stoolfire promptly answered by letter of March 20, 1923, in which he outlined what had been done, but stated that the preferred liens of the company had increased by time and interest to such an extent that the stockholders could hardly expect to receive anything on their stock holdings. He further stated that, while the book accounts of the company were being kept as before, the company itself was considered defunct, and that the only thing left in contemplation was the winding up of its affairs. There was a further suggestion by Mr. Stoolfire that, because of the trust and confidence that had been reposed in him by all parties concerned, he would endeavor to make such a disposition of the whole matter in the end as the parties would consider satisfactory under the circumstances. Mr. McCurdy replied to this letter on April 9, 1923, expressing his satisfaction with what had been done in

the past and his willingness to leave the future disposition of matters to Mr. Stoolfire's judgment. No further correspondence ensued until August 7, 1926.

In the meantime, a transaction occurred which supplies the real reason and furnishes the actual ground underlying the basis of this lawsuit. The Washington Water Power Company, representing interests totally different from those of the parties concerned in this action, desired to purchase some of the properties owned and held by the valley company and by Mr. Stoolfire and other parties. Protracted negotiations led to a contract dated May 29, 1925, wherein the valley company was to convey to the Washington Water Power Company certain lands specifically described, and also certain easements and riparian rights incident to other lands, for the sum of two hundred thousand dollars. The contract was consummated by the execution of the necessary instruments and the payment of $125,734.24, which was the balance remaining after certain obligations had been discharged by the traction company according to the terms of the contract.

The properties conveyed to the Washington Water Power Company included the properties which had, in 1913, been transferred by the traction company to the valley company. In the meantime, however, the valley company had itself acquired additional valuable property, all of which entered into the deal with the Washington Water Power Company. It does not appear from the record correspondence that the McCurdys were ever personally notified of this transaction. The failure to be so advised furnishes one of the main contentions by them that they had been defrauded. It will be borne in mind that the McCurdys had no stock in the valley company, also that the transaction between the traction company, in which they were stock-

holders, and the valley company occurred years before, in 1913; so that, if that transaction was valid, it would naturally follow that there was no obligation, necessity or requirement for Mr. Stoolfire to advise them of the deal with the Washington Water Power Company.

After the execution of the contract with Washington Water Power Company, Mr. Stoolfire, on August 7, 1926, wrote to Mr. McCurdy, advising him that steps should be taken to disincorporate the traction company and dispose of its assets. Mr. McCurdy was advised that there would not be sufficient money even to pay outstanding obligations of the company, and that, of course, nothing would be left for the stockholders. Mr. Stoolfire suggested that a meeting of the stockholders be held for that purpose, and enclosed notice of such meeting to be held August 31, 1926. Mr. McCurdy failed to answer that letter, and on July 26, 1927, Mr. Stoolfire again wrote to Mr. McCurdy, advising him that the proposed meeting had been adjourned from month to month awaiting a reply from Mr. McCurdy, and enclosing another notice of such meeting to be held August 31, 1927. Mr. McCurdy answered that letter under date of August 4, 1927, enclosing proxies to Mr. Stoolfire to vote the McCurdy stock at the proposed meeting. It appears that the meeting was ultimately held on December 16, 1927, and the trustees were directed to dispose of the company's assets and wind up its affairs.

In the meantime, Mr. Stoolfire had written to Mr. McCurdy again, advising him that the assets would not pay the debts of the company, and that nothing would be left for the stockholders. He did, however, offer to pay the McCurdys the sum of three hundred dollars if they would consent to the dissolution of the traction company. This was not with the idea that their stock was worth anything, but merely because Mr. Stoolfire

felt that he wanted to see that the McCurdys got at least a little something for it. Mr. Stoolfire also requested that Mr. McCurdy should express any suggestions or criticism that he might have regarding the matter, and sent him a statement of the traction company's accounts as of date September 1, 1919, beyond which time the books showed no material change except for cumulative interest on the outstanding indebtedness. On December 7, 1927, Mr. McCurdy wrote to Mr. Stoolfire, saying that the proposition made by the latter relative to the stock was agreeable, though disappointing, and asking Mr. Stoolfire to increase the amount if he possibly could. Before the transfer of the stock was completed, Mr. Stoolfire died on January 13, 1928.

In August, 1928, Mrs. Stoolfire, widow of Mr. Stoolfire and executrix of his estate, wrote to Mr. McCurdy, informing him of her husband's death and expressing her willingness to increase the amount of the offer concerning the stock from three hundred dollars to four hundred dollars, saying that she felt this would have met with her husband's approval. The stock was accordingly sent and the money paid.

Bringing this period to a close, so far as the affairs of the traction company are concerned, its books, according to an accountant's statement, show that, on December 16, 1927, the advances made by Mr. Stoolfire and his associates on the principal and interest of the Jenkins mortgage, plus interest owing to them thereon, amounted to $138,520.33, and that taxes, plus interest thereon, amounted to $6,515.98, or a total of $145,036.31. The advances on principal and interest on the Jenkins mortgage, without figuring any interest to Mr. Stoolfire or his associates on the moneys actually advanced, amounted to $76,296.23, and on taxes, $4,259.15, or a total of $80,555.38. This latter amount

is important because it entered into the court's ultimate computations. The story of the various transactions and events was brought to a close by the commencement of this action in 1929.

At the conclusion of the evidence, the trial court expressed the view that what had transpired prior to the third period, that is, prior to 1918, of itself constituted no basis for the action, but that Mr. Stoolfire's failure to apprise the McCurdys of the existence of the contract with the Washington Water Power Company constituted a fraudulent concealment, for which an action would lie. The court was also of the opinion that, despite the organization of the valley company in 1913, and despite the consequent transfer of certain of the traction company's properties to it and the separate existence of the two companies thereafter, they were, nevertheless, to be considered as one corporation, in legal effect; that Mr. Stoolfire conducted the two corporations as one enterprise, "as though the traction company was his right hand and the power company was his left." Proceeding from the view thus expressed, the court concluded that, while the action was one for rescission, the case nevertheless disposed itself equitably to the granting of judgment for damages for the value of respondents' stock, the judgment to be impressed as a lien upon the funds derived from the sale of the properties to the Washington Water Power Company.

Having adopted this theory, the court then set about to determine some equitable basis of division of the proceeds of the sale. The case was reopened and considerable evidence was taken regarding the values of the properties that entered into the Washington Water Power Company deal, the object being to set a value upon the properties formerly owned by the traction company as compared with that of the properties that

the valley company owned in its own right and in addition to the traction company's properties. The court adopted the testimony of respondents' witnesses on that phase of the matter.

The method of calculation followed this course: From the purchase price of $200,000 to be paid by the Washington Water Power Company, under the contract, was deducted the sum of $74,265.76, which it was necessary to expend in order to complete full title to the properties covered by the contract. This left a balance of $125,734.24. From this amount, the court then deducted the total principal and interest actually paid by Mr. Stoolfire and his associates on the Jenkins mortgage and for taxes, aggregating the sum of $80,-555.38, already mentioned above. This left a net amount of $45,178.86 for distribution between the traction company and the valley company. It will be observed that the court allowed no interest on the money so advanced by Mr. Stoolfire and his contributing associates. It will also be noted that the court took no account of the $22,500 of the traction company's indebtedness charged off in consideration of its conveyance to the valley company in 1913.

The court further found that certain of the traction company's property which entered into the Washington Water Power Company deal had an additional special value of $9,060. This amount was deducted from the $45,178.86 and set aside for the exclusive benefit of the traction company. This left a base amount of $36,118.86 for distribution between the two companies.

The court then determined that the value of the traction company's property, so conveyed, aside from the special values above referred to, compared with the value of the valley company's property in the ratio of 22.3 to 77.7. On this basis, the traction com-

pany was entitled to receive $8,054.50 of the base amount, to which was added the $9,060 representing special values and making a total of $17,114.50 to be allocated to the traction company; the balance of $28,064.36 was allocated to the valley company. The $17,114.50 was then divided among the stockholders of the traction company on the basis of their respective stock holdings. This gave the McCurdy interests the sum of $8,296.81 and the Stoolfire interests $8,817.69. The court allowed a credit of $400 on the $8,296.81, to offset the amount already paid for the transfer of the stock, and then entered a judgment for the balance, in the sum of $7,896.81.

Lengthy as our statement of the case is, we do not assume or pretend to have meticulously covered all of the details. That would be well-nigh impossible, unless this opinion should go to an inordinate length. It may even be that, from our limited statement, some hasty conclusions, or inferences, unfavorable to Mr. Stoolfire might be drawn. If we consider only the situations as they obtained in 1906 and in 1929, the bald fact stands out that, in the beginning, the McCurdys had a very substantial interest in highly speculative property, and that, in the end, they had nothing. The events of the intervening time, however, supply the full explanation and a reasonable understanding of how and why the venture resulted as it did. Even without the testimony of Mr. Stoolfire, whose lips are sealed in death, we have not been able to arrive at any conclusion that would impeach either his integrity or the indefatigability of his efforts to promote the interests of the traction company, and to convert the speculative value of its properties into material wealth for enjoyment by the McCurdys to the extent of their interest. We say this because we think that, in justice to Mr. Stoolfire, it should be said.

But, limiting ourselves to the judgment rendered by the court, based upon the conclusions that were expressed in the several oral opinions and the computations upon which the judge proceeded, we do not think that it can be upheld.

In the first place, if we go back to 1913, when the properties were transferred from the traction company, through Mr. Stoolfire, to the valley company, there is no question that the amount of the consideration was a fair one. The fact that all that the traction company got was a credit on its indebtedness can make no difference; nor does the fact that the property was transferred to the valley company, in which Mr. Stoolfire was heavily interested, rather than to a totally disinterested individual or corporation, make any difference. The traction company got what the properties were worth, and therefore it had no further interest in them. That, of itself, was sufficient to negative any basis for this action. *Briggs & Co. v. Harper Clay Products Co.*, 150 Wash. 235, 272 Pac. 962; *Westland v. Post Land Co.*, 115 Wash. 329, 197 Pac. 44.

But aside from that, by the end of the second period, in 1918, the McCurdys either had, or, as the court stated, had ample means at hand for obtaining, full and complete knowledge relative to all of the affairs of the traction company and the actions of Mr. Stoolfire in connection therewith. Their failure to act upon the information which they had, or to which their attention was directed, was sufficient to remove the last vestige of any claim that the McCurdys may have otherwise had. *Deering v. Holcomb*, 26 Wash. 588, 67 Pac. 561; *Johnston v. Spokane & Inland Empire R. Co.*, 104 Wash. 562, 177 Pac. 810; *Noyes v. Parsons*, 104 Wash. 594, 177 Pac. 651.

We now take up the theory of the trial court. We have already set forth the circumstances under

which the two corporations were organized and the method of their operation from the time of their organization. The court held that the two corporations were to be adjudged as one entity; that the valley company was but the extension of the traction company, and that the activities of the latter were, in legal effect, the activities of the former *pro tanto*. The adoption of that theory furnished the basis for deducting the amounts paid on the Jenkins mortgage and for taxes, totaling $80,555.38, from the net amount received from the Washington Water Power Company, rather than deducting them from the amount which, under the court's method of computation, was the value of the traction company's properties, namely, $37,098.73. The difference in the result of the two methods of computation is at once apparent. If the indebtedness had been deducted from the value of the traction company's properties, there would, of course, have been a deficiency instead of a balance.

It will be borne in mind that the Washington Water Power Company was not purchasing the stock of the traction company, or of the valley company, but merely certain of their properties. When the relative amounts, based on values, were allocated to the two respective corporations, as they should have been, then, and only then, did there come into play the right and necessity of deducting the indebtedness of either in order to determine how much, if anything, the respective stockholders were entitled to receive. The method adopted by the court compelled the valley company to stand about seventy-five per cent of the traction company's indebtedness, in which the valley company was in no way concerned and which had originated long before the valley company had come into existence.

What the valley company got from the traction com-

pany in 1913 was property, not stock. There is nothing in the record which indicates, nor is it even contended, that the valley company, in fact or in law, assumed any of the indebtedness of the traction company. When the properties were ultimately sold jointly, the indebtedness of the traction company was its own, separate and distinct.

To put the matter concretely, the division between the two corporations was a division upon the basis of relative property values; the division between the McCurdy interests and the Stoolfire interests was a division upon the basis of relative stock values. When it came to a division upon the basis of stock, there was no value, because the indebtedness of the traction company far exceeded its assets, and the stock was therefore valueless.

The doctrine obtaining in this jurisdiction which permits, or compels, under certain circumstances, the disregard of the juridical conception of separate corporate existence, does not apply to the case at bar. In adjudicating two corporations to be, in legal effect, one, it must appear that the one so dominates and controls the other as to make the other a mere tool or instrument of the one, so that justice requires the dominant corporation to be held liable for the results, and, further, that there shall be such a commingling of their funds and property interests, and their affairs so intimately related in management, that to consider them other than as one would work a fraud upon third persons. *First National Bank v. Walton,* 146 Wash. 367, 262 Pac. 984; *Briggs & Co. v. Harper Clay Products Co.,* 150 Wash. 235, 272 Pac. 962; *Pittsburg Reflector Co. v. Dwyer,* 173 Wash. 552, 23 P. (2d) 1114.

Neither the traction company nor the valley company dominated or controlled the other. While Mr. Stoolfire may have dominated both, his domination

was exerted upon each as a separate concern. They were at all times kept separate and distinct, and neither encroached upon the other in its operation, even though the respective properties were geographically contiguous. There was no commingling of funds or property interests. If the traction company had any funds, they did not pass to the valley company. The property which did pass was all real estate, and retained its form and identity after the conveyance to the valley company and until it was finally conveyed to the Washington Water Power Company. The protection of the traction company's rights, which would include the rights of the McCurdys, would in no event have called for anything more than the return of the property to its original owner, or, after its disposition in connection with other property, the proportionate part of the purchase price measured by its relative value. The ends of justice would have required nothing more than that.

The doctrine of theoretical merger of identities has been evolved to operate as a shield and a protection against fraud and injustice; it is not to be used as a sword or bludgeon to accomplish an injustice. To saddle the major part of the traction company's indebtedness upon the valley company would be a perversion of justice in this instance.

■ It is urgently contended that the relationship between Mr. Stoolfire and the McCurdys was of such a fiduciary nature that it was incumbent upon Mr. Stoolfire to reveal to the McCurdys the facts concerning the Washington Water·Power Company contract at the time of taking over the McCurdy stock, and that the failure to make such revelation amounted to fraud. Under the facts as they have been heretofore stated, we do not think that this contention can be sustained. We are wholly unable to interpret the evidence as

showing any activity on the part of Mr. Stoolfire to conceal anything from the McCurdys. Further, it seems to us that he gave them every opportunity, not only to participate in the affairs of the traction company as they progressed, but also to satisfy themselves as to the value of their stock upon its release.

Fraud is of such nature that it does not easily lend itself to classification, but, in so far as one case may be said to be an authority upon subsequent states of fact, we think that the present case falls within the principles announced in *Haverland v. Lane,* 89 Wash. 557, 154 Pac. 1118. The later case of *Voellmeck v. Harding,* 166 Wash. 93, 6 P. (2d) 373, permitted recovery under a somewhat similar situation, but in that case there was active concealment and positive misrepresentation, elements which are lacking here.

But even if the basis of an action for fraud were here present, still the respondents could not recover, because, as already stated, their stock was wholly without value. It had no market value, and the company's liabilities far exceeded its assets. There was nothing upon which damages could be hinged.

From any one, or all, of the angles from which we approach and consider this case, we conclude that there was no basis for the action. The judgment is reversed, with instruction to dismiss.

BEALS, C. J., MITCHELL, MILLARD, and MAIN, JJ., concur.