(No. 7048. May 22, 1943.)

CARL N. ANDERSON, Respondent, v. T. J. LLOYD, Appellant.

[139 Pac. (2d) 244.]

Rehearing Denied July 13, 1943

Chapman & Chapman, Parry & Thoman, and J. R. Keenan for appellant.

Harry Benoit and Harry Povey for respondents.

GIVENS, J.—In 1921, E. E. Bascom, Joe Hull, and respondent each contributed $2,000 and formed a tri-party partnership, which purchased the bottling works, including a Coca Cola franchise, from Benoit & Sons, in Twin Falls. Later in the year appellant purchased Hull's interest. Bascom sold his share to appellant and respondent in 1929, repurchasing after a few months, and finally sold his share to respondent in 1936.

In 1931 appellant and respondent, retaining their respective one-third and two-thirds interests therein, converted the partnership into two corporations—to avoid partnership liability and to comply with the restrictions of the parent Coca Cola company prohibiting the sale of both fountain and bottled Coca Cola by one concern. Appellant acquiesced and participated in such transmutation and is in no position to upbraid respondent on account thereof, as he does.

In December, 1938, respondent purchased appellant's stock for $25,000, paying part down, the balance to be paid in installments secured by pledge of the stock, with the privilege of substituting other security.

In June, 1940, respondent sold the corporation for $200,-

000 to Tyrus Cobb of baseball fame and requested the certificates of stock, offering to pay the balance due or substitute therefor other commensurate security. Appellant, learning of the sale to Cobb, rescinded the contract and refused to deliver the stock on the ground he had been overreached and deceived by appellant in that his stock was worth $50,000 at the time of the sale, tendered the amount received by him to date, and offered to deliver the note covering the balance.

Neither side giving way and each rejecting the other's overtures, respondent, to resolve the resultant impasse, sued to enforce delivery of the stock, tendering payment in full or substitution of adequate security. Appellant countered with answer and cross-complaint, detailing respondent's duplicity thus:

"That from 1929 respondent was the actual manager of the business and personally directed and carried it on, was at all times thoroughly acquainted and familiar with all details and value thereof, its Coca Cola franchise, good will, and going concern value, inherent values, earning capacity, and all angles thereof.

"That, on the other hand, appellant did not devote his whole time and energy to said business, was not actually engaged in managing and operating the same, was not thoroughly acquainted and familiar with it and its value, as was respondent. That for many years prior to December, 1938, he was engaged in other businesses and occupations, part of the time as an employee of the United States, which required his absence from Twin Falls, and by reason thereof and other facts and circumstances was not acquainted with all the facts and circumstances which reflected the true value of the business, nor was he acquainted with the inherent value of the various franchises and rights possessed and owned by it, nor whether the books truly and accurately reflected the value thereof.

"That prior to December, 1938, appellant had trusted and relied implicitly upon respondent in the conduct and management of the business and for all his knowledge as to the true value thereof, and by reason of said long partnership and business relationship there was a fiduciary relationship existing between appellant as minority stockholder and respondent as majority stockholder, who was sole manager.

"Prior to December, 1938, respondent sought to induce

appellant to sell his interest and made, on numerous and diverse occasions, many representations that appellant's one-third interest was worth considerably less than $25,000, repeatedly intimated and told appellant said business was beset with many troubles, was besieged with competition, and its Coca Cola franchise was no longer of any particular value. Appellant was reluctant and not anxious to sell his interest but relied implicitly and absolutely upon respondent's representations and statements as to the low value of his share, which representations were made for the purpose of inducing him to sell and were relied upon by him. That said representations were not true and correct; the value of his share was $50,000 or more, as was known to respondent, and appellant was greatly damaged by such representations.

"That at the time of accepting the stock in the reorganized corporation in 1939 appellant was still ignorant of the value of his interest."

Respondent denied these allegations and interposed as affirmative defenses thereto:

"That during the partnership appellant was acquainted and familiar with the business, its books, assets, amount of business, and was just as familiar with the value thereof as respondent, and had access to and examined the books of the partnership.

"That appellant was elected a director of each of the two corporations and was president until March, 1938, when he become vice president, continuing so until he sold his stock.

"That between November, 1931, and December 5, 1938, appellant attended all stockholders' and directors' meetings, was entirely familiar and acquainted with the business operations and assets of said corporation, value of the stock, books, and had access to the latter, and received statements during all said times of the business."

The court, without a jury, entered judgment in favor of respondent, with consequent appeal herein.

The pertinent findings are:

"That between November, 1931, and December 5, 1938, when appellant sold his stock, he attended stockholders' and directors' meetings of said corporations, and was familiar with the books and the value of the stock thereof.

"That August 30, 1938, respondent and appellant discussed the sale of the stock and at no time did respondent

knowingly and/or fraudulently make any false representations to appellant as to any material facts or material future intentions, did not fail to disclose any facts concerning the value of the stock of which he had personal knowledge; that appellant knew as much about the value of the stock at the time of the sale as respondent; that appellant did not rely upon any representations made by respondent but relied upon his own knowledge and judgment as to the value of the stock; that $25,000 was not below the fair and reasonable market value of the stock at the time of the sale; that a strained relationship and coolness had arisen between respondent and appellant not later than the March, 1938, annual meeting of the stockholders and directors; that appellant is and was at all times a man of business experience, and there existed no financial exigencies or other coercive circumstances to induce him to sell his stock, and he was not induced by respondent to sell his stock but was in fact the moving party in bringing about the sale."

The trial court concluded: .

"8. That as a matter of law the plaintiff did not knowingly or fraudulently make any false misrepresentations to the defendant, and did not fail to disclose any fact concerning the value of said stock, of which he had personal knowledge and did not induce the defendant to sell to him said stock and that the defendant was charged with . knowledge of the value of the said stock."

Appellant's first group of assignments of error challenges the findings as insufficient and too vague to support the judgment. The ultimate and controlling questions of fact were whether any actionable misrepresentations had been made or concealment practiced whereby respondent was induced to sell the stock for less than its true value.

While the findings did not enumerate the asserted misrepresentations exactly as narrated in appellant's pleadings, they substantially disposed of the issues as definitely as they were set forth therein. The court has held on numerous occasions that

"A failure to make specific findings on certain allegations contained in defendant's further and separate answer to the plaintiff's complaint is not reversible error, for the reason that the findings that were made by the court are inconsistent with the truth of those allegations of defen-

dant's answer, and the court has therefore found against defendant on such issues.

\* \* \*

" 'The findings made disposed of the merits of the case, and are inconsistent with the defendant's case, and in effect are against the defendant on the issue tendered by the answer. The defense urged in this case is wholly inconsistent with the finding of the court . . . The rule, as we understand it, is that, where the findings of the court upon the affirmative case are necessarily a complete negative of the case as plead by the answer, such findings are sufficient.' " (*Matthews v. Coate,* 17 Ida. 624, at 629-30, 106 P. 990.)

(*Mine and Smelter Supply Co. v. Idaho Consolidated Mines Co.,* 20 Ida. 300, 118 P. 301; *Stewart v. Stewart,* 32 Ida. 180, at 183-4, 180 P. 165.)

Findings of fact must be liberally construed. (*Fouch v. Bates,* 18 Ida. 374, 110 P. 265; *Marysville Development Company v. Hargis,* 41 Ida. 257, 239 P. 522; *Fairbairn v. Keith,* 47 Ida. 507, 276 P. 966; *Cleveland v. Mochel,* 48 Ida. 37, 279 P. 410; *First Security Bank v. Zaring Farm & Livestock Co.,* 51 Ida. 700, 10 P. (2d) 303; *Gem State Lbr. Co. v. Galion Irr. Land Co.,* 55 Ida. 314, 41 P. (2d) 620.)

Furthermore, since no more specific findings were requested, no reversible error is presented. (*Gould v. Hill,* 43 Ida. 93, at 110, 251 P. 167; *Reid v. Keator,* 55 Ida. 172, at 183, 39 P. (2d) 926; *Mitchell v. Munn Warehouse Co.,* 59 Ida. 661, at 674, 86 P. (2d) 174.)

A case which might be considered strongly in appellant's favor held that an officer buying stock from a minority stockholder was required only to "acquaint her with all material facts bearing on the transaction." This, the court herein found, respondent did. (*Hotchkiss v. Fischer,* 136 Kan 530, 16 P. (2d) 531.)

Whether, after the creation of the corporations, the partnership relation, imposing on respondent the duties of a fiduciary as to disclosures, continued was an issue of fact to be determined from all the facts and circumstances. (*Miller v. Mitcham,* 21 Ida. 741, 123 P. 141; *Bussell v. Barry,* 61 Ida. 216, 102 P. (2d) 276; *Commercial Security Co. v. Modesto Drug Co.,* 43 Cal. App. 162, 184 P. 964; *Scott v. Prescott,* 69 Mont. 540, 223 P. 490; *Sun River Stock & Land Co. v. Montana Trust & Savings Bank,* 81 Mont.

222, 262 P. 1039; In re Russell's Estate, 102 Mont. 301, 59 P. (2d) 777.)

While appellant repeatedly reiterated his trust and confidence in respondent and that he relied solely on his judgment as to the value of the stock, there is evidence to the effect that between the time the sale was first actively broached in August and its consummation in December, 1938, appellant consulted with someone in San Francisco as to the value of the Coca Cola franchise and business and upon his return demanded $25,000 instead of $20,000, which respondent thought had been agreed upon. Furthermore, as to the physical assets, appellant received from an auditor employed by him in 1937 the following statement:

"Mr. T. J. Lloyd

"In compiling the audit requested and enclosed I did not attempt to go into the matter of gross sales and current expense of operation as to do so would take lengthy time and I carefully recorded the items of which I thought that you would be interested in and I find no item of expenditure which looks out of place to me.

"There will appear in the January statement that is brought to the annual meeting of the directors of the corporation a complete detailed description of gross sales and gross expense incurred in making said sales for income tax purposes. Mr. Anderson informs me that he has and will cooperate with you in all ways and you are at liberty to personally or by agent to inspect his records at any time and it is his wish that you attend all meetings of the board of directors when called and especially the annual meeting on the second Monday of January, 1938.

"Respectfully submitted this 7th day of December, 1937.

R. M. Cunningham.

"THE FOLLOWING IS A REPORT OF AN AUDIT OF THE CAPITAL INVESTMENT LABOR, AND SOME ITEMS OF EXPENSE OF THE TWIN FALLS COCA COLA BOTTLING WORKS AND THE SUBSIDIARY WESTERN SALES COMPANY, HANDLING THE BEER SALES FOR THE ABOVE CORPORATION OF TWIN FALLS, IDAHO AS OF DECEMBER 1st, 1937. COMBINING TWIN FALLS, BURLEY, & SHOSHONE PLANTS.

At the request of the president of the corporation Mr. T. J. Lloyd of Twin Falls, Idaho.

"Land at beginning of organization and still holding:

| | |
|---|---:|
| Twin Falls, 2 lots on Truck Lane, Book value | $4000.00 |
| Shoshone, Idaho, 1 lot, " " | 800.00 |
| Buildings, Shoshone Plant | 1000.00 |
| " Residence | 1200.00 |
| Total Real Estate | 7000.00 |
| Book Value Shoshone Plant $5606.08 less Dep. $3135.95 | 2470.13 |
| Twin Falls Plant $8370.28 Less Dep. Net | 3670.28 |
| Burley $2513.18 Net | 2513.18 |
| Western Sales $1129.04 Net | 1129.04 |

Added 1937

| | |
|---|---:|
| Twin Falls, Washer cost $5600.00 | 5600.00 |

this item was purchased under contract $1000.00 paid on delivery and balance payable $190.00 per month and unpaid on December 1, 1937 $3850.00

Twin Falls Plant:

| | |
|---|---:|
| One Schlitz Bottler | 211.50 |
| One C. C. Cooler | 272.00 |
| One Plant Cooler | 1050.00 |
| One shed for loading and receiving | 300.00 |

Furniture and Fixtures:

| | |
|---|---:|
| Shoshone Plant | 112.40 |
| Twin Falls Plant | 203.43 |
| Burley Plant | 190.82 |
| Western Sales Co. | 181.21 |

Transportation Equipment:

| | |
|---|---:|
| Shoshone Plant, 2 units $3924.57 less Dep. $2250.40 net | 1674.17 |

to this one item of replacement one new Diamond

| | |
|---|---:|
| T Truck, sale of Dodge at $140 net with body | 1304.90 |

Twin Falls Plant, 3 units cost $4092.08 less Dep. $2504.00 added to this one new Diamond T unit

| | |
|---|---:|
| $1765.00 net | 3353.08 |
| Burley Plant, 2 units cost $2222.60 less Dep. net | 922.60 |
| Total book value of capital investments December 1st, 1937 | 32159.64 |
| Less contracts payable | 3850.00 |
| Net worth Real | 28309.64 |

"Larger items of expense noted:

Labor to July 1st, 1937 total reported $6648.53 of which 32

employees were reported and Carl N. Anderson received $200.00 per month and Kernell Anderson rated $30.00 weekly July 1st to Sept. 30. 51 employees drew $9848.41 of which Carl N. Anderson received $250.00 monthly and Kernell Anderson received $30.00 weekly. Also spent for current items $5258.73 for bottle replacement and $933.41 for syphon bottles for service.

"One meeting of the board of directors was held May 13th, 1937. President T. J. Lloyd absent, Carl N. Anderson, Sec.-Treasurer, and manager (present) and Kernell Anderson Vice President (present) one item of business voted on raising manager Carl N. Anderson from $200.00 to $250.00 monthly as salary and Western Sales Co. a subsidiary to pay $150.00 monthly to Carl N. Anderson as salary same does not appear in reports available to federal or state old age benefit compensation. No dividends were voted in meeting and meeting adjourned at 8:30 P. M. May 13th 1937.

"I, R. M. Cunningham of Twin Falls, Idaho, certify that the above is a true and correct statement taken from the books and records of the above mentioned corporation dated this 7th day of December 1937.

R. M. Cunningham
Accountant and Manager of
Security Audit Company of
Twin Falls, Idaho."

Also, prior to the sale appellant had a statement of the business prepared by Mr. Gwin, the regular bookkeeper of the corporation, which is self-explanatory.

"Profit and Loss
Statement
1937

TWIN FALLS COCA-COLA BOTTLING CO. AND
WESTERN SALES, INC.

| | | |
|---|---:|---:|
| Mdse. Sales | $416,505.13 | |
| Less returns | 10,913.21 | |
| Net Sales | | $405,591.92 |
| Purchases | 361,640.26 | |
| Less returns | 40,981.05 | |
| | 320,659.21 | |
| Inv. 1/1/37 (Add) | 12,879.56 | |
| Total | 333,538.77 | |
| Inv. 12/31/37 (deduct) | 14,225.62 | |

COST OF MERCHANDISE ............ 319,313.15 319,313.15
GROSS PROFIT FROM SALES ............................ 86,278.77
Expense (see sheet No. 2—itemized) .................... 70,805.41
NET PROFIT (before depreciation) .................... 15,473.36

DEDUCT THE FOLLOWING LOSSES:
Dep. Twin Falls Natl. Bank .......... 632.30
Replacement of ice machine .......... 390.57
 Total (deduct) ................................ 1,022.87 1,022.87
 14,450.49

DEDUCT THE FOLLOWING DEPRECIATION
CHARGES:
Plant Building ...................................... 40.00
Residence Building ........................... 48.00
Plant Equipment .................................. 2,076.68
Trucks ..................................................... 1,370.25
Res for Bad accounts ........................... 3,300.00
Furniture and fixtures ......................... 76.35
 Total (deduct) ................................ 6,911.28 6,911.28
OTHER INCOME (add) ...................... 7,539.21
Discounts taken ................................. 329.85
Rents received ...................................... 171.27
 Total ........................................... 501.12 501.12
NET GAIN FOR YEAR (after
depreciation) ....................................... $ 8,040.33"

"PROFIT AND LOSS
STATEMENT
1937
TWIN FALLS COCA COLA BOTTLING CO. AND
WESTERN SALES, INC.
EXPENSE

Factory Labor ...................................................$ 6,396.20
Rent Paid ................................................... 1,398.00
Light and Power .......................................... 891.41
Fuel ................................................................ 474.63
Water ............................................................. 139.97
Machinery repairs ....................................... 1,345.16
Insurance ..................................................... 1,427.57
Taxes ............................................................. 1,210.25
Sanitation supplies ..................................... 363.60
Repairs to buildings ................................... 479.26
Miscl. Factory Expense .............................. 176.35
Selling—Salaries ....................................... 3,383.62
 Commissions ......................................... 2,146.14 .

| | |
|---|---:|
| Traveling | 5,773.75 |
| Advertising | 2,042.67 |
| Tel. & Teleg. | 718.42 |
| Miscellaneous | 255.63 |
| Delivery—Salaries | 5,813.11 |
| Auto Exp. | 9,534.45 |
| Garage Rent | 16.00 |
| Miscellaneous | 12.70 |
| Adm. Exp.—Officers Salaries | 5,790.00 |
| Managers " | 3,898.35 |
| Office Salaries | 2,662.48 |
| Office supplies | 678.19 |
| Postage | 12.72 |
| Legal Expense | 208.40 |
| Dues, Subscriptions | 20.00 |
| Miscellaneous | 31.30 |
| Social Security Payments | 714.76 |
| State Unemployment Ins. | 549.61 |
| Interest Paid (washer) | 13.30 |
| Discounts allowed | 207.85 |
| Donations | 69.06 |
| Beer Stamps bought | 11,950.50 |
| Total | $70,805.41" |

### "BALANCE SHEET
#### December 31st, 1937

### TWIN FALLS COCA-COLA BOTTLING CO. & WESTERN SALES INC.

| | | |
|---|---:|---:|
| Cash on hand and in banks | | $ 3,391.32 |
| Notes Receivable | $ 2,758.13 | |
| Accounts Receivable | 31,098.38 | |
| Total | 33,856.51 | |
| Less reserve for bad debts | 9,910.00 | |
| | | 23,946.51 |
| Inventories of merchandise | | 14,225.62 |
| Stock Home Loan Company | | 87.50 |
| Buildings | 2,487.65 | |
| Machinery and Equipment | 26,024.56 | |
| Furniture and Fixtures | 812.86 | |
| Delivery trucks and equipment | 14,294.82 | |
| Mills Coca-Cola Cooler | 250.00 | |

```
Total ................................................... 43,869.89
Less reserve for deprec. ........................ 20,621.55
 ─────────
 23,248.34
Land—Lots at Twin Falls and Shoshone .......... 4,800.00
 TOTAL ASSETS ........................... $69,699.29
Accounts Payable ............................... 20,277.60
Notes Payable (washer—$190.00 monthly) ........ 3,840.00
Capital Stock—T F Coca Cola Bottling Co......... 24,000.00
 Western Sales, Inc. ......................... 15,000.00
Earned Surplus ................................ 6,581.69

 TOTAL LIABILITIES ......................... $69,699.29
```

### ACCOUNTS PAYABLE

```
Miscellaneous ...............................$ 4,027.10
Martin Roark ............................... 910.16
Becker Brewing & Malt Co. &
 Becker Products Co. ..................... 8,520.23
 ─────────
 13,457.49
Beckers (cooperage acct.) .................. 3,829.50
C. N. Anderson and Bascom .................. 2,990.61
 ─────────
 Total ................................... 20,277.60"
```

While appellant criticizes the bookkeeping and asserts the books did not sufficiently disclose the actual condition of the business, particularly that the franchise was not carried thereon, he knew all the time the company owned the franchise and that it was not so carried. Mr. Gwin, prior to the time he became bookkeeper for the companies, had for years been a bookkeeper in the bank of which appellant was a director, had occasionally performed work for appellant, and no complaint was made of his bookkeeping at the time appellant was a director and officer. At the trial two auditors, one employed by appellant and one by respondent, introduced audits and resumes made by them and were examined and cross-examined at length, and, while they do not agree in all particulars, the trial court was justified in concluding, as he did in effect, that the books were not deceivingly deficient or that they had been kept in such a way as to mislead appellant or anyone else.

Appellant contends he employed Cunningham in 1937

merely to secure information for his attorney (Mr. Wolfe) in connection with the consolidation of the two corporations. Respondent testified such reorganization was not even hinted at at that time, nor until 1939 after appellant had sold his stock. The employment of Cunningham, therefore, was a circumstance which the trial court might well have considered as indicating appellant did not have complete confidence in respondent's management of the business and was not then relying upon him as a fiduciary partner. Furthermore, there is testimony by both respondent and Mr. Gwin that appellant prior to 1938 was dissatisfied with the way the business was run, particularly as to expenses, and on one occasion was extremely angry over the failure of the business to return dividends, and was disappointed in the showing reflected in the statements submitted by Mr. Gwin, and they are not discredited.

Anent returns from the business, appellant received $1,000 in dividends during seven years of the total time he was interested in the concern, and $5,000 as a special dividend in 1933 (which the other stockholders also received). He paid only $2,000 for his share initially and thus received in all $31,000 in seventeen years on a $2,000 investment.

█ If respondent concealed no information he possessed and should have imparted, and made no false representations which induced the sale, and his conduct measured up to that required of a fiduciary, recission is not required. The asserted over-reaching revolves around the value of the so-called unlimited Coca Cola franchise and the beer agencies. The value arrived at from various estimates and criteria detailed by respective witnesses for appellant and respondent engaged in the Coca Cola and beer business throughout Idaho and adjoining states, fixed the value of the entire business at the time of the sale in 1938 all the way from $70,000 to $263,000.

█ Appellant testified respondent painted to him a most discouraging and gloomy picture of the business and its future and that respondent was the aggressive factor in bringing about the sale. There is ample evidence, however, to justify the trial court in finding appellant was anxious to sell. (*Lyon v. Carey,* 111 Kan. 470, 206 P. 1109.) Mr. Gwin, the bookkeeper of the company, gave the increase in the bottling of Coca Cola in detail for 1936,

1937, and 1938, and it is not an unfair inference from the record that respondent knew of this increase.

"Q. Now could you for 1938, Mr. Gwin, give us in dollars and cents the gross proceeds from the jobbing division of the business? * * *

"A. $306,603.66. * * *

"Q. Now what about the manufacturing sales for 1938?

"A. They were $91,543.46. * * *

"Q. Now then can you give the jobbing and manufacturing figures for 1937, Mr. Gwin? * * *

"A. Jobbing was $333,560.71. * * *

"Q. Now then what was the manufacturing sales?

"A. $72,031.21.

"Q. Now then, for 1936 can you give us those figures?

"A. The jobbing sales was * * * $308,412.33.

"Q. And now the manufacturing?

"A. $35,969.08."

Appellant, until 1933, was conducting confectionery businesses in the same sales area, namely, the nine south central counties of Idaho. His place of business was only half a block from the bottling works, and respondent testified he had numerous talks and conferences with him. While appellant had been a most successful businessman, respondent, until he purchased into the partnership in 1921, had been a mail carrier without previous business experience of any kind.

Three other Coca Cola concerns, one in Lewiston, one in Coeur d'Alene, and one in Yakima, Washington, were sold during the same pertinent period. The trial court was justified in considering thereby and therefrom that the owners who sold the same thought the future of such businesses was no brighter than respondent did. No market value for appellant's stock was shown, nor that he could have sold it for any amount to anyone except respondent.

Appellant urges that, in addition to the increase in the Coca Cola business, the sale of the entire business 18 months after respondent had purchased appellant's one-third interest therein, proves respondent was dishonest and insincere in his discouraging prognostications. The increase in the Coca Cola business up to the time appellant sold to respondent was known by appellant or the information was as readily accessible to him as respondent. While the subsequent sale was perhaps a circumstance to be considered, because of the time elapsed and changed conditions it does

not of itself so prove respondent knew he was wrong in his portents or was not making honest disclosures as to what he considered appellant's stock was worth in 1939 as to demand reversal. (*Smith v. Johnson,* 47 Ida. 468, 276 P. 320.) Mr. Cobb purchased this particular company, not a minority interest therein, in order to set his son, Hershel Cobb, the real owner, up in business, for what evidently appeared to him to be sufficient reasons, which reasons might not have actuated anyone else; at least, no one else offered to buy at the price he paid. Also, in the interim, the company had made some improvements, changed its location, and, due apparently to the national advertising of the parent Coca Cola company and the low per capita consumption of Coca Cola in the northwest, the Coca Cola business made rapid strides. By fortuitous events which it is not shown respondent foresaw, nor had any appreciable control over, the advance in the value of the business does not necessarily portray the true picture in 1938 when the stock was sold, and, as stated in *Du Pont v. Du Pont,* 256 Fed. 129, at 186, if conditions had taken a different turn, there would have been a different retrospective outlook.

Appellant's main point is that there was at least a confidential relationship between him and respondent whereby respondent was under the duty of making full and truthful disclosure of everything he knew about the business and its value. Conceding that there was a confidential relationship, if respondent concealed no material facts which he knew and made no erroneous or false statements, no recovery against him is justified. The following covers all of the alleged misrepresentations or concealments:

That Anderson, concerning the development of the Coca Cola franchise, said it had reached its peak; that he enumerated the brands generally considered competitive to Coca Cola and said the competition would be more keen and more extreme than it had been in the past; regarding the value, that there would perhaps be no further increase in the soda water business in 1938, however, he did not expect that there would be any decrease; that he was afraid of competition from other cola drinks. Edwin Lloyd testified to the same effect.

Respondent denied stating that Coca Cola had reached its peak, that there would perhaps be no increase in Coca

Cola from thereon, or that he was afraid of competition from other drinks.

The statements as to the Coca Cola business having reached its peak and that competition would be more keen and more extreme were mere statements of opinion.

Appellant further testified that respondent told him he was definitely going out of the beer business, that there was no longer any profit in handling beer, that the beer business was so encumbered by regulations that it was hard to handle, and that it cost so much to procure the patronage, that he had complained before about the margin of profit being so small and the competition becoming more keen and that he thought it would be wise for the company to discontinue the beer business. Respondent testified if there was anything said about beer, he was sure he said it was a losing business, and that he had told him before he thought it would be better to discontinue it. Mr. Lloyd further testified that he has made discovery that this was one of the best beer agencies in the state, and that he also discovered that in 1933, 1934, and 1935 there was much more profit made on beer than there was in 1937 and 1938.

While appellant's witness Mitchell testified that the value of a beer business having the gross sales this company had would be at least $27,000 or $28,000, and the witness Martin testified the value of the business would be 10% of 90% of the gross sales, or $27,000, at page 91 of plaintiff's exhibit "EE", the following is shown:

| | Total Revenue | Total Expense | Net Gain |
|---|---|---|---|
| SCHLITZ BEER | | | |
| 1937 | $21,242.69 | $20,142.93 | $1,099.76 |
| 1938 | $24,109.32 | $29,529.57 | $5,420.25 (loss) |
| To Oct. 31, | | | |
| 1939 | $15,616.66 | $25,182.60 | $9,565.94 (loss) |
| BECKERS BEER | | | |
| 1937 | $20,946.84 | $19,862.35 | $1,084.49 |
| 1938 | $15,092.11 | $18,485.04 | $3,392.93 (loss) |
| To Oct. 31, | | | |
| 1939 | $ 8,482.90 | $13,678.91 | $5,196.01 (loss) |

Apparently, therefore, the only statement regarding beer which respondent may have made which was not true was that he was going to discontinue handling it. A small profit is disclosed for 1934, and losses were suffered in the years 1935 and 1936, as well as 1938 and 1939. That

he was going out of the beer business was a declaration of future policy and not a false representation.

Appellant testified respondent stated the business wasn't worth $15,000 but that he would give that for appellant's one-third interest; and Edwin Lloyd testified respondent said the business was not worth $20,000. Respondent testified: "then I asked him what he wanted for it and he says: 'Well I thought it was worth twenty-thousand dollars.'", and that appellant had, while in San Francisco, "contacted the members of this board and this man stated to him that he had investigated Coca Cola stock on the coast and franchises and that he told him if he was to sell he should have twenty-five-thousand dollars for his one-third and then he turned to me and said: 'Well, I can't sell for less than twenty-five thousand dollars.' * * * I told him I would give him the twenty-five thousand, after sitting and thinking it over a little bit."

Witnesses placed the total value of the business at from $70,000 to $263,000, respondent's witnesses testifying the value was $70,000 and $77,000. Appellant argues these valuations are too low because the hypothetical questions put to the witnesses omitted the following items:

| | |
|---|---|
| Cash average | $ 3,173.13 |
| Accounts and notes receivable | $24,430.38 |
| Real estate | $ 4,800.00 |
| Buildings | $ 2,487.65 |
| Inventory short | $ 6,000.00 |
| Less debts | $24,066.97 |

The profit and loss statement for 1937, a copy of which was given Mr. Lloyd, contained the following:

| | |
|---|---|
| Cash on hand | $ 3,391.32 |
| Accounts receivable (less reserve for bad debts) | $23,946.51 |
| Real estate | $ 4,800.00 |
| Buildings | $ 2,487.65 |
| Accounts payable | $20,277.60 |
| Notes payable | $ 3,840.00 |

With the exception of the item "Inventory short $6,000.00" the items in the two lists are very nearly the same in amount. Appellant, therefore, at the time of the sale, was aware of the value of the real estate and buildings owned, the amount of the accounts and notes receivable and payable, and the amount of cash on hand (although defen-

dant's exhibit 32 reveals that on December 31, 1938, only 26 days after the sale, there was no cash on hand, the bank account being overdrawn $232.59).

The 1937 profit and loss statement contains the item "Inventories of merchandise—$14,225.62." The hypothetical questions put to Harper, Bogard, Simmons, and Chaffee contained the following items:

| | |
|---|---|
| Fountain syrup | $ 213.20 |
| Fountain supplies | $3478.45 |
| Syrup, bottles, cartons and crowns | $1225.40 |
| Other merchandise | $3966.42 |
| | $8883.47 |

This amount is approximately $6,000 less than the inventory of merchandise contained in the 1937 profit and loss statement, and apparently this is the item "Inventory short $6,000.00" referred to by appellant in his list of items omitted. The hypothetical question upon which Hershel Cobb placed his valuation of $75,000 contained the following items of merchandise:

| | |
|---|---|
| Beer on hand | $6761.30 |
| Fountain syrup | $ 213.20 |
| Fountain supplies | $3478.45 |
| Syrup, bottles, cartons and crowns | $1225.40 |
| Other supplies | $3966.42 |
| | $15644.77 |

Since the amount of the debts practically cancels the amount of the accounts and notes receivable, the only items omitted from the question put to Cobb are, cash average $3,173.13, real estate $4,800.00, and buildings $2,487.65, all of which items were contained in the 1937 profit and loss statement.

Thus, the only showing that the business was worth more than $75,000 is the fact that it was resold eighteen months later for $200,000. Such increase was not a conclusive showing that Anderson either made false statements or refrained from disclosing correct information. As indicated above, at the most is was only a circumstance for the trial court to take into consideration. This court has no right to substitute its judgment as to what the facts show when there is a conflict.

 The testimony of experts has been held to be merely advisory and not binding upon the court. Even though the so-called experts did not take into consideration certain claimed items of value, they were cross-examined relative thereto, their failure to so take them into consideration was before the court, the evidence in regard thereto was fully covered on direct and cross-examination, and appellant had received the statements which contained the items claimed to have been omitted. Thus, there was no concealment with regard to them or their effect upon the value of the business at the time he sold his interest therein, and all the circumstances surrounding the effect of such items on the value of the business were before the trial court, and it was merely for him to determine therefrom, and from the other evidence, the value of the stock.

 The evidence is voluminous, at least three-fourths of it having to do with the disputed value of the Coca Cola franchise both in fact and theory. We have carefully read the transcript and examined the limited number of exhibits which counsel by stipulation have agreed are the important ones and brought before us, segregated from the "truck-load" before the trial court. The evidence is conflicting, and justification for many different conclusions could be found. The trial court saw and heard the witnesses and chose to give credence to respondent's presentation, and we are justified in saying there is sufficient, competent evidence to sustain his findings and conclusions that appellant was not entitled to rescission. (*McDermott v. O'Neil*, 200 Wis. 423, 228 N. W. 481; *Schuur v. Berry*, 285 Mich. 654, 281 N. W. 393.)

Therefore, under the well known rule, the judgment is affirmed. Costs awarded to respondent.

Budge, J., and Buckner, D.J., concur.

DUNLAP, J., dissenting.—One of the important questions in this case is whether or not a confidential relationship existed at the time of the sale of appellant's interest to respondent, and during the time of the negotiations between the parties leading up to the sale.

The business started as a partnership in 1921. In 1931 it was incorporated by the formation of two corporations, the purpose of which was to avoid partnership liability and to comply with the restrictions of the parent Coca-Cola company prohibiting the sale of both fountain and bottled Coca-Cola by one concern.

The parties continued to conduct the business in the same manner and on the same basis as prior to incorporation. The respondent was the managing head, and in sole charge of the business during both periods of time, and after incorporation the business was treated by both parties as one concern, one set of books being used to record the transactions of the business, in the same manner as before incorporation, and generally the affairs of the concern were handled on the same basis and in the same manner as before.

For the purpose of differentiating between the responsibility of respondent to appellant prior to incorporation, and subsequent thereto, respondent has pointed out the distinction between a corporation and a partnership, and has cited authorities stating the general rule to the effect that an officer or director does not sustain a fiduciary relation to individual stockholders with respect to his stock, which we believe correctly states the general rule. However, these authorities are not persuasive on the claim of respondent that by reason of the formation of the corporations, and the operation of the business thereunder, his responsibility to appellant in the matter of the disclosures and statements of the corporations' business was not as it was before the incorporation.

Under the facts disclosed in this case, respondent owed the same duty to appellant with respect to these matters as he did prior to incorporation. The undisputed evidence discloses that appellant had very little to do with the operation of the business. He was away from the scene of operations much of the time and engaged in other business activities. Respondent was at all times in full charge and control.

The respective positions of the parties to this suit, therefore, as between them, for all practical purposes, continued the relationship of partners, and likewise continued the duty and responsibility of partners, bottomed on high principles of morality, right, equity and justice.

"Confidential relations exist wherever confidence is reposed and accepted, and the one has it in his power in a secret manner, for his own advantage, to sacrifice those interests of the other which he is bound in honor and good conscience to protect. (1 Story, Eq. Jur., Sec. 323.) The rule embraces both technical fiduciary relations, and those informal relations which exist whenever one man trusts

in and relies upon another. (*Coghill v. Kennedy*, supra, p. 658, 659 of 119 Ala. (24 So. 468) ; *Raney v. Raney*, supra, p. 34 of 216 Ala. (112 So. 316) ; *Ziegler v. Coffin*, Ala., 123 So. 22, 63 A. L. R., at 945.)"

See also Restatement of Law, Restitution, p. 676; 23 Am. Jur., 763 and 764, Sec. 14; 23 Am. Jur., p. 858 and 859, Sec. 81; *Addis v. Grange*, Ill., 192 N. E. 774, 96 A. L. R. 611, 13 Am. Jur., and the following cases referred to in 84 A. L. R., see p. 608 to 628; *Hotchkiss v. Fisher*, Kans., 16 P. (2d) 531; *Buckley v. Buckley*, 230 Mich. 504, 202 N. W. 955; *Bollstrom v. Duplex Power Car Co.*, 208 Mich. 15, 175 N. W. 492; *Saville v. Sweet*, 254 N. Y. Supp. 768; *Voellmeck v. Harding*, 166 Wash. 93, 6 P. (2d) 373; 84 A. L. R. 608; *Lightner v. Hill*, 258 Mich. 50, 242 N. W. 218, 84 A. L. R. 601.)

Having formed the conclusion the confidential relationship existed, it placed upon respondent, as the managing agent of the business, the duty to disclose to appellant fully all matters within his knowledge in connection with the business at the time of the negotiations for the sale of appellant's interest to respondent. There can be no doubt that respondent's knowledge of the business, and its intimate details, its growth and development, and opportunities for the future, was much greater than that of appellant, even though appellant did make some independent investigation of the affairs of the concern by the employment of an auditor to examine the books and by some inquiry of others.

Even though it be conceded respondent made no false statements in connection with the business affairs of the concern to appellant, I still think in the matter of the negotiations for the sale of appellant's stock, his relation to appellant was such that he was not in a position to offer to purchase, or to purchase, his stock for less than its then value, without, at the time, disclosing to appellant all matters in connection with the corporation's business which affected or related to the value of the business at that time.

In the case of *Lightner v. Hill*, 258 Mich. 50, 242 N. W. 218, 84 A. L. R. 601, the Supreme Court of Michigan quoted with approval from the case of *Strong v. Reptide*, 213 U. S. 419, 29 S. Ct. 521, 53 Law Ed. 853, a case where the president of the corporation purchased stock at much less

than its par value as known to him and due to conditions unknown to stockholders, as follows:

"If it were conceded for the purpose of argument that the ordinary relations between directors and shareholders in a business corporation, are not of such a fiduciary nature as to make it the duty of a director to disclose to the shareholder the general knowledge which he may possess regarding the value of shares of the company before he purchases any from a shareholder, yet there are cases where by reason of the special facts, such duty exists. The Supreme Court of Kansas and Georgia have held the relationship existed in cases before those courts because of special facts which took them out of the general rule and that under those facts a director could not purchase from the shareholder his shares without informing him of the facts which affected their value."

In the case of *Stewart v. Harris*, 69 Ks. 498, 77 P. 277, 66 L. R. A. 261, 105 Am. St. Rep. 178, 2 Ann. Cas. 873, the third syllabus by the court reads as follows:

"A director or managing officer of a corporation having a knowledge of the condition of the affairs of such corporation, because of the trust relation and the superior opportunities afforded for acquiring information, before he can rightly purchase the stock of one not actively engaged in the managing of its affairs must inform such stockholder of the true conditions of the affairs of the corporation."

In the opinion, the court said:

"Defendant suggests that plaintiff should have himself exercised more diligence in investigating the affairs of the bank; that the books of the bank were open to him. By this we are asked to say that in this case of means of knowledge is equivalent to knowledge; that a clue to the facts, which if diligently followed up would lead to a disclosure, is equivalent to discovery. Plaintiff could not be required to make an investigation of the books of the bank to determine its financial condition simply because it was in his power to do so. The diligence required by one to protect his interests is only such as a person of ordinary prudence would exercise under like circumstances. In a case like the one under review, the trust relation existing between the parties, the superior opportunities of defendant to know the condition of the affairs of the bank, and his actual knowledge of its affairs, required no such diligence

of inquiry on the part of plaintiff as is contended for by defendant. Plaintiff had the right to rely upon the belief that defendant would disclose to him the true condition of the affairs of the bank, and that he would not be called upon to investigate the condition of its affairs before he could with safety sell to defendant his holdings of stock. It is not the intent of the law to place a restraint on the affairs of business, when conducted fairly, honestly, and openly, nor to deprive one party to a contract of the advantage which superior judgment, greater skill, or better information may give; but it cannot give its approval to a course of dealing that will permit those occupying a trust relation to be unmindful of the trust, betray the confidence reposed, and profit by such betrayal."

It appears from respondent's testimony that on August 30, 1938 he and Mr. Lloyd engaged in a conversation with respect to the sale of the stock, and at that time Mr. Lloyd told Mr. Anderson he had made up his mind he was going to sell the stock; that Mr. Anderson asked him what he wanted for his stock, and Lloyd said he thought it was worth $20,000.00 and that Mr. Anderson replied he would give him $18,000.00; that in reply to this, Mr. Lloyd said he thought he ought to have $20,000 and Mr. Anderson then said, "I will give $20,000.00."

With respect to the negotiations for sale, Mr. Anderson testified further, in part, as follows: "Well, we talked in general terms about the deal; I brought up the question, and one reason also was that I owed money at the bank, and if I should take and buy the lots, I would have to borrow, then, $2000, or buy his stock I would have to borrow that $2000 and if I bought the lots, I would have to borrow that, and Cleo-cola was in with its bottling works. Pepsi-cola was just coming in. I believe they had just opened up, just before, and with soda water, and they had nothing but big 12 oz. bottles. I felt it might be that they would even cut prices, and I didn't know whether I could make the payments and I would come out broke. I had no other investment."

Further, in answer to the question, "What else was said there?", Anderson testified: "I don't recall. That was about all. We just talked back and forth. Tom said he didn't see how business conditions would make any change and (interruption) about the business conditions, Tom said he

couldn't see there would be any material changes, and I didn't have to worry about that as far as he could see."

When asked further what was said at the time, Anderson testified in substance, as follows: "I don't think I can remember anything particular outside of that, only that we talked about the deal in general terms." Then he went on to explain: "Perhaps I should have said in connection with buying his stock."

Anderson remembered he had mentioned about Pepsi-cola and Cleo-cola, and said he might have mentioned Royal Crown and Dr. Pepper, competitive drinks. Further, Anderson said they talked about general conditions with relation to the various competitors of Coca-Cola. He also said he mentioned the cutting of prices and things of that nature, and how they would materially disturb the sale of soda water, and that he was worried. Further, Anderson testified that in this conversation nothing was said with respect to the volume of the Coca-Cola which had been bottled by the business. In the evening conversation of the same day, with respect to the business, Anderson stated nothing concerning the business of the company was discussed, outside of what he had mentioned. He was sure they didn't discuss the amount of Coca-Cola that had been bottled. There was nothing said about beer, and if there had been he would have told them it was a losing business; he had told him (Mr. Lloyd) a number of times before, he thought it would be much better to discontinue the beer.

As further appears from the record, Anderson was in touch with, and had personal supervision of, the business every day. He therefore knew all the facts in connection with the business. This business was showing a steady, healthy increase year by year, especially from the year 1936 on. Anderson was familiar with and knew the developments in the bottling business generally, and knew the business was gaining generally, and he had full and complete knowledge of all things pertaining to the Twin Falls business, and pertaining to the Coca-Cola and bottling business in general, and particularly in the Northwest. He attended various bottling conventions and Coca-Cola meetings; he met their representatives and likewise distributors from other places.

It would appear from the foregoing testimony that Anderson was trying to buy Lloyd's stock as cheaply as he could. To say the least, his statements with respect to

the business matters of the concern did not reflect, and were not intended to reflect, a very optimistic viewpoint. As a matter of fact, the word picture as painted by him, was discouraging. Under my view of the law, he was in duty bound not only to say nothing that would have the effect of depreciating the value of the business, and Lloyd's interest therein, but he was under obligation to disclose to Lloyd his real opinion as to the business, and also the real facts in connection with its value. While it may be conceded there were probably no express misstatements; nevertheless it seems to me there was an overreaching.

The following finding of the trial court, to-wit: "The sum of $25,000.00 was not below the fair and reasonable market value of defendant's stock at the time of the sale," is assigned as error. I think this finding is not supported by any competent, creditable or substantial evidence. The testimony of the value of the business at the time of the sale fixes the value all the way from $70,000.00 to $263,-000.00.

Respondent testified in effect in answer to a question as to his idea of the market value of the business on December 6, 1938, that he was of the opinion it was from $70,000 to $75,000, and that Mr. Lloyd's one-third interest in the stock of the two corporations at that time was of the value of from $18,000 to $20,000.

As against this expression of value on December 5, 1938, I cannot overlook the fact that some fifteen months later, with an additional investment in equipment of only from $29,000 to $30,000 the business sold for the sum of $200,-000.00 and that some of respondent's "expert" witnesses testified that at the time of this second sale the business was worth from $180,000 to $200,000, the gross amount that was received, out of which indebtedness of the business in the sum of approximately $44,000 was to be paid.

In addition to the testimony of respondent himself, as to his idea of the value, it is apparent from respondent's brief and the oral argument, that he relies upon the claim the evidence supports the finding of the trial court as to the value of the testimony of his experts Bogard, Harper, Simmons, Chaffee and Cobb. The testimony of each of these witnesses as to the value of the business was based on similar hypothetical questions, and each one of these questions was, in my opinion, insufficient from the standpoint

of law, and objections to the questions should have been sustained.

The value of testimony of this nature depends upon the facts considered by the expert in arriving at the answer. In other words, the answer must be based on the question; if a question as to the value of a business fails to enumerate important, substantial items which are necessarily a part of the assets, then the answer is bound to be erroneous.

The questions asked these "experts" omitted items necessary to be considered in reaching the valuation of the business, i.e., cash on hand, notes and accounts receivable, and real estate.

At the close of the business in 1938, it appears there was cash on hand in the business, in the sum of $3,340.69; the accounts and notes receivable figured on the books in the sum of $23,946.51; the land and buildings were valued in the sum of $7,287.65. Here is a total ascertained value of over $34,000.

Neither did the opinion of the experts take into account the indebtedness of the business, which must necessarily also be considered in determining what a business is worth.

The opinion answers of the experts to the hypothetical question, are therefore of no probative value because necessary elements were omitted. The rule is:

"The weight to be given expert testimony hinges on, among other things, the expert's means of knowledge; his competency, extent of experience and study of witness, whether witness is biased, *the facts upon which the opinion is based,* and of course, the integrity of the witness." (*Hull v. City of St. Louis,* 138 Mo. 618, 40 S. W. 89, 42 L. R. A. 753; *Stroscheim v. Shay,* 63 Ida. 360, 120 P. (2d) 267 at 271.)

"In *Sharp v. Baker,* 22 Tex. 306, the court, referring to evidence which was introduced without objection, said: 'the admission of such evidence without objection does not add any weight to it, if intrinsically it had none, and should have been excluded, upon objection. Evidence does not have weight because it is admitted, but it is admitted because it deserves to have weight.' " (*Evans v. Cavanagh,* 58 Ida. at 333.)

"An opinion is not conclusive even though uncontradicted but should be weighed by the trier of the facts, and judged in view of all the evidence, including in the case

of land, a view, if any was afforded. Probative value depends on the facts on which the opinion is based, and if devoid of substantial factual support, the opinion is entitled to little or no weight, and will be insufficient to support a verdict or finding or to take the issue to the jury. * * *

"They are to consider such facts—that is, the facts mentioned in the hypothetical question, whether such facts do actually exist, whether there is evidence on which to base them—because if one fact supposed to be true, included in the question, is untrue, not supported by the evidence, then the opinion is valueless. The opinion is given upon a certain state of facts supposed to be true, and the jury cannot tell what the opinion would have been if one of these facts had been withdrawn." (Jones, Commentaries on Evidence, 1913 Ed., Vol. 2, p. 975, 976.)

That the finding of the trial court, under discussion, is not supported by the evidence, is clear from the following extracts from the testimony of the various expert witnesses:

Mr. Bogard testified in effect he valued the Coca-Cola business in 1938 at $77,000 and the only item in estimating the value, that he considered, was the amount of Coca-Cola syrup bottled during the year 1938; he considered no other item and he did not place any value on the list of machinery and equipment mentioned in the hypothetical question. He testified further, the value of the Coca-Cola franchise and the plant, was at the rate of $10 per gallon. Further, the method of arriving at the value of Coca-Cola bottling plant is generally $10 per gallon for the amount of syrup bottled during the year, the only variation being where the equipment is particularly outstanding, or the population is unusually dense or unusually sparse, and that these facts would affect the $10 per gallon valuation, and he made no variation with respect to the Twin Falls plant, and he made no allowances one way or the other; that the place was just mediocre. And, in answer to the question as to whether the list of equipment mentioned in the hypothetical question affected his valuation of $77,000, he stated the plant was not included in the franchise. Further, he was asked to assume the plant was not included in the franchise, as to his opinion as to the valuation of the franchise, to which he replied that it would be between $70,000 and $75,000 and this figured the value of the franchise excluding the plant, and that the difference between this figure and the $77,000 estimate of the value of the business, would be $2,000,

assuming that the franchise was valued at $75,000. Further, he said the remainder of the business over and above the value of the franchise, had very little value. It is evident the witness considered the business conducted by the Twin Falls company, outside of its Coca-Cola business, worth very little; however he finally admitted when pressed, that such business would have a value. Again, on re-direct examination, Mr. Bogard testified that the values placed on Coca-Cola plants at so much per gallon included everything that goes with the bottling plant in the conduct of the business, including the soda water business, equipment, stock of merchandise on hand. He thought that the reasonable value of appellant's one-third interest in the stock was $20,000; when asked what the price included, that is, the $20,000 price of the one-third interest, and also the value on the business as a whole, he testified it included the stock in the company with all the assets which had been enumerated in the hypothetical question. The hypothetical question did not include tangible assets which have heretofore been enumerated in this opinion. A second hypothetical question, as to the value of the business on June 7, 1940, was asked of Mr. Bogard, as follows:

"Now, assume that at Shoshone the same bottling equipment was there in June, 1940, as has heretofore been related to you, and assuming that the plant is as it was in 1940— as it was in 1938—as I enumerated to you, and assuming that the plant had purchased new equipment and machinery and spent money in improvements at an additional cost of between $29,000 and $30,000, and assuming that on July 7th, 1940 there was bottled 6674 gallons of Coca-Cola, I would ask you, what, in your opinion, would be the reasonable market value of the business on July 7, 1940?" Mr. Bogard answered to the effect that the plant would have a value of around $200,000.00.

Mr. Harper, in his testimony as to the value, which was virtually the same as that fixed by Mr. Bogard, did not take into consideration cash on hand, notes and accounts receivable, real estate, etc. Neither did he take into consideration Coca-Cola coolers, nor the value of the machinery and equipment belonging to the company and located at Shoshone, and at Burley. He thought the good will of the soda water business, outside of the Coca-Cola business, would have a value. He didn't know what the value of the general jobbing business done at Twin Falls would be, and

did not take into consideration, or place any value on the sale of the Coca-Cola fountain syrup, and, in giving the estimate of the value of the Twin Falls business, he did not include the beer business to have any value.

Mr. George Chaffee, another expert called by respondent, who was in the bottling business at Pocatello, testified in reply to a hypothetical question similar to that asked of witnesses Bogard and Harper, that he considered the business as being worth around $75,000. It will be noted that this question likewise eliminated physical assets such as real estate, accounts and notes receivable, cash, etc.

Mr. Cobb, manager of the bottling works at Twin Falls, was asked a hypothetical question similar to that propounded to the other expert witnesses. His estimate of the value of the business was between $75,000 and $76,000. He estimated the value of the business as of June 7, 1940, to be $200,000.00. His value was placed on the franchise, and that included the entire operation. In the matter of valuation he estimated the trucks to be worth between $4,000 and $5,000, equipment between $6,000 and $7,000, and merchandise on hand between $14,000 and $15,000. He did not take into consideration the physical assets such as real estate, cash on hand, notes and accounts receivable.

The testimony of Mr. Simmons, another expert witness called by respondent, is in substance as follows: He is a resident of Idaho Falls and had been a bottler of Coca-Cola. He quit the business in 1940. He judged the business to be worth between $70,000 and $75,000. His estimated value placed on the equipment was the sum of $23,000 and that included trucks, equipment and inventory. He fixed the value of the inventory as about $9,000 and about $6,000 as the value of the trucks, and on the bottling machinery and equipment, about $8,000.00. And, he took into consideration that they had 23,000 bottles on hand. But, he did not take into consideration the matter of cash, real estate, and accounts and notes receivable.

For the reasons above stated, the judgment should be reversed, and the cause remanded for a new trial.

I am authorized to say that Holden, C.J., concurs in this dissenting opinion.